UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS GOOLSBY,<br><br>                              Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>                              Defendants. | Case No.:  3:17-cv-564-WQH-NLS<br><br>**REPORT AND RECOMMENDATION FOR ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO STRIKE**<br><br>**and**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR EARLY DISCOVERY**<br><br>**[ECF Nos. 67, 74]** |

Before the Court are Defendants' motion to dismiss, ECF No. 67; and Plaintiff, Thomas Goolsby's, motion for leave to conduct early discovery,  ECF No. 74.  One factor relevant to the motion for leave to conduct early discovery is whether the complaint will survive a motion to dismiss, so the Court finds it appropriate to address both motions simultaneously.

# PROCEDURAL BACKGROUND

Plaintiff initially filed a complaint on March 21, 2017.  ECF No. 1.  Plaintiff was granted *in forma pauperis* ("IFP") status but his complaint failed to survive screening pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A.  ECF No. 4.  Plaintiff was given leave to amend to correct deficiencies.  *Id.*  On August 11, 2017, Plaintiff filed his amended complaint.  ECF No. 9.  Again, the complaint failed to survive screening and Plaintiff was given leave to amend.  ECF No. 11.  On January 8, 2018, Plaintiff filed his Second Amended Complaint.  ECF No. 12.  For the third time, Plaintiff's complaint was dismissed and he was given a "one *final* opportunity" to amend to correct deficiencies.  ECF No. 14 (emphasis in original).  Plaintiff filed his Third Amended Complaint on April 23, 2018.  ECF No. 15.  The complaint survived screening and, due to Plaintiff's IFP status, the Marshals were directed to serve the complaint.  ECF No. 16.

In response to the Marshals' efforts to serve the deputies identified—all employees of the San Diego County Sheriff's Department—28 summons were returned unexecuted, most of which indicate:  "Per San Diego Sheriff's Department, they have more than one deputy with this last name.  More information needed to identify defendant."  *See generally,* ECF Nos. 20-47.  In order to gather more information to effectuate service, Plaintiff moves for leave to conduct early discovery to gather information sufficient to identify the unserved deputies.  ECF No. 74.  Defendants oppose, arguing that Plaintiff's complaint will not survive a motion to dismiss, rendering early discovery unnecessary and inappropriate.  ECF No. 80.

II.

# ALLEGATIONS OF THE THIRD AMENDED COMPLAINT

Plaintiff alleges violations of his Eighth and Fourteenth Amendment rights stemming from his incarceration at the San Diego County Jail ("SDCJ") between December 12, 2016 and May 17, 2017.  ECF No. 15 [Third Amended Complaint,

"TAC"] at 8-9, ¶¶ 1-2, 5.[1]   Plaintiff's complaint alleges three claims:  (1) lack of Fourteenth Amendment due process in his classification and extended placement in administrative segregation ("ad seg"); (2) conditions of confinement that violate his Eighth Amendment rights, specifically, depriving him of sleep; and (3) conditions of confinement that violate his Eighth Amendment rights, specifically, depriving him out-of-cell exercise.

## A. Placement in Administrative Segregation

Plaintiff alleges that upon his transfer from Kern Valley State prison to SDCJ the classification committee, comprised of "Lt. Smith, Sgt. Lawson, Sgt. Froisted, Deputy Price, Deputy Leon, Deputy Bravo, Deputy Martinez, and Deputy Rios," placed Plaintiff in solitary confinement without providing any reason to Plaintiff.  TAC at 14, ¶¶ 60-61.  Plaintiff alleges he repeatedly asked the John Doe[2] defendants escorting him the reason for his placement to which they responded, "I don't know, it is classification's decision." *Id.* at ¶ 61.  Plaintiff states he immediately filed an inmate request with the classification department seeking written notice and explanation of Plaintiff's classification and placement but did not receive a response.  *Id.* at ¶ 62.  He then filed a grievance regarding his placement and seeking an explanation, to which Sgt. Lawson replied but "refus[ed] to tell [Plaintiff] the reason for his solitary confinement placement or provide him with notice, hearing or allow rebuttal."  *Id.* at ¶¶ 63-64.  Plaintiff appealed Sgt. Lawson's answer as inadequate, but received no response to his appeal.  *Id.* at 15, ¶ 65.

Plaintiff alleges that SDCJ has a policy that limits disciplinary segregation to 10 days, but that he was held for 150 days and "took a plea deal just to escape the harsh conditions of solitary confinement."  *Id.* at 19, ¶¶ 83-84.  Plaintiff alleges that because he was placed in solitary confinement, he was unable to participate in programs and benefits

---

[1] All page number references use the header generated by CM/ECF.  For references to the Plaintiff's TAC in particular, paragraph references are to the paragraphs as numbered by Plaintiff, however some paragraph numbers are used on multiple pages and so the Court uses a dual reference as needed.
[2] This is the only allegation/mention of any John Doe defendants in the TAC.

available to inmates in general population, ranging from access to board games, cleaning supplies, and out-of-cell exercise to participation in educational and rehabilitative programs for good time credit. *Id.* at 15, ¶ 66-19, ¶ 81.

## B. Sleep Deprivation

Plaintiff's complaint includes multiple factors that contributed to sleep deprivation. First, Plaintiff alleges he was unable to sleep due to policies instituted by Sheriff Gore and the SDCJ including:  cell count at 11:00 p.m. and 3:30 a.m.; serving breakfast from 4-4:30 a.m.; and that cells were kept at high bright light levels until after razor pick-up at 1:00 a.m. and for the 3:30 a.m. cell count, and then switched to low light (never darkness). *Id.* at ¶¶ 85, 89.

Plaintiff also faults various individual defendants for sleep deprivation due to their permitting or selecting excessively loud TV volume until 9:45 p.m. (and 10:45 p.m. on weekends) and starting again at 7:00 a.m. *Id.* at ¶ 85.  Plaintiff also alleges during razor pass-out and pick up, which happened during odd hours of the night, certain defendants engaged in excessively loud tray slot door slamming between 12:00 a.m. and 1:00 a.m. *Id.*  Plaintiff alleges that he approached several defendants making the excessive noise and those who had the authority to order razors be passed out and picked up at an earlier time and in a quieter manner, and asked that it proceed more quietly and informed defendants of the effect the noise had on his sleep, to no avail. *Id.* at ¶ 86.

Placement in ad seg also meant placement with mentally ill inmates, who contributed to Plaintiff's inability to sleep.  Plaintiff alleges he complained "about being housed with mentally ill inmates who bang, yell, scream, throw urine, feces, food, spit and throw trash…" and further disrupted his sleep.  *Id.*  Plaintiff alleges he "submitted dozens of inmate requests and letters" to several defendants asking to be rehoused, but "despite being put on repeated notice of the injuries being suffered by Plaintiff due to the actions of the mentally ill inmates they did nothing and allowed Plaintiff to continue to suffer." *Id.* at ¶ 87.

Plaintiff specifically alleges he told defendants Deputies Oliver, Brewer, Gonzales, Price, and Lovelace during their hourly walks through the housing unit that Plaintiff was experiencing sleep deprivation due to the factors outlined above, but that none took action to remedy the situation. *Id.* at 28, ¶¶ 110-112; 30, ¶114. Similarly, Plaintiff alleges he met with Lt. Kevin Kamoss[3] on February 3, 2017, and on at least two other occasions during Saturday inspections to inform him of Plaintiff's sleep deprivation caused by the actions and/or policies of the SDCJ and its deputies. *Id.* at 30, ¶ 115.

Plaintiff alleges that sleep deprivation caused him "severe physical and psychological injuries" such as headaches, fatigue, high blood pressure, depression, and "inability to concentrate or effectively cooperate with his criminal case." *Id.* at ¶ 88.[4]

### C. Out of Cell Exercise

Plaintiff claims that "beginning February 7, 2017" he was "denied all out-of cell exercise, including access to the indoor rec-yard." *Id.* at 25, ¶ 98. Plaintiff "repeatedly requested yard access" but was denied. *Id.* at ¶ 101. Plaintiff alleges he stopped defendant Deputy Price to ask for out of cell exercise and informed him that the lack of out of cell exercise was causing Plaintiff physical and psychological harm. *Id.* at 29, ¶ 113. As a result of the deprivation, Plaintiff alleges he suffered from "headaches, breathing difficulties, muscle and ligament tightening, cardiovascular regression, weight gain, and depression, as well as other physical and psychological injuries." *Id.* at 26, ¶ 104. Plaintiff requests injunctive, compensatory, punitive, and declaratory relief. TAC at 32.

---

[3] Defendant Kevin Kamoss was erroneously identified as "Karl Kamoss" in the initial motion to dismiss filing. *See* ECF No. 67. Defendants filed a notice of errata correcting the name. ECF No. 76. Plaintiff has no objection and confirms Kevin Kamoss is the proper defendant. ECF No. 82. The Court hereby substitutes Kevin Kamoss throughout the motion to dismiss.

[4] Plaintiff's TAC also contains several paragraphs detailing attempts to file grievances regarding policies and sleep deprivation and a letter to Sheriff Gore. ECF No. 15 at ¶-96. These paragraphs demonstrate exhaustion of remedies but are not otherwise relevant to Plaintiff's claim of sleep deprivation.

## III.

## MOTION TO STRIKE

Among the allegations outlined above, the TAC also contains a lengthy comparison of the conditions and policies applicable to the inmates housed in general population and those in ad seg. ECF No. 15 at 15, ¶¶ 66-67; 16, ¶¶ 68-71; 17, ¶¶ 68-73; 18, ¶¶ 74-78; 19, ¶¶ 79-81. Defendants argue the comparisons between general population and ad seg are impertinent and irrelevant to the claims alleged and should be stricken. In response, Plaintiff points to the Screening Order from Judge Hayes setting forth that to establish a liberty interest sufficient to state a due process claim, Plaintiff must allege the differences between general population at SDCJ and segregation at SDCJ. *See* ECF No. 11 at 6. Defendants' reply distinguishes case law cited to by Plaintiff but fails to address the specific direction provided to Plaintiff by the court. ECF No. 83 at 2.

The Due Process Clause protects prisoners against deprivation or restraint of a protected liberty interest. The Supreme Court in *Sandin* makes clear that the focus of the liberty interest inquiry is whether the challenged condition imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003); *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). The Ninth Circuit explained that "*Sandin* requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003). "What less egregious condition or combination of conditions or factors would meet the test requires case by case, fact by fact consideration." *Id.* (*citing Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir. 1996)). And while atypical and significant hardship requires fact-specific analysis unique to each case, the factors courts consider include:

3:17-cv-564-WQH-NLS

> 1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence.

*Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003). Other circuits address similar factors, and also generally require detailed facts, particularly for confinements lasting longer than 100 days. *See Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000) ("we think it appropriate to advise the district courts of this Circuit that in cases challenging SHU confinements of durations within the range bracketed by 101 days[] and 305 days, development of a detailed record will assist appellate review") (internal footnote omitted); *see also Est. of DiMarco v. Wyoming Dept. of Corrections, Div. of Prisons*, 473 F.3d 1334, 1342 (10th Cir. 2007) (the courts consider four factors: "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson;* and (4) the placement is indeterminate.").

Here, Plaintiff's allegations include that "per SDCJ policy, the longest duration of Disciplinary segregation is ten (10) days. Plaintiff was kept in solitary, in worse conditions, for 15 times longer for no legitimate reason." ECF No. 15 at 19, ¶ 83. The comparisons include facts to address the conditions and circumstances that will invariably affect the duration of the prisoner's sentence. *Id.* at 15-19. Under any standard, these allegations are relevant to the factors courts examine to determine whether a liberty interest is implicated by the confinement.

Rule 12 permits the court to "strike from a pleading … any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12 (f). In light of due process jurisprudence, the comparisons between general population and solitary confinement outlined by Plaintiff appear relevant and pertinent to the claims alleged and the factors

the court must analyze. The undersigned **RECOMMENDS** the motion to strike be **DENIED**.

### IV.

### <u>MOTION TO DISMISS</u>

**A. Legal Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim tests the legal sufficiency of a plaintiff's claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When considering the motion, the court must accept as true all well-pleaded factual allegations in the complaint. *Bell Atlantic Corp. v. Twombly*, 556 U.S. 544, 555 (2007). The court need not accept as true legal conclusions cast as factual allegations. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient).

A complaint must "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. To survive a motion to dismiss, a complaint must include non-conclusory factual content. *Id.* at 555; *Iqbal*, 556 U.S. at 679. The facts and the reasonable inferences drawn from those facts must show a plausible—not just a possible—claim for relief. *Twombly*, 550 U.S. at 556; *Iqbal*, 557 U.S. at 679; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). The focus is on the complaint, as opposed to any new facts alleged in, for example, the opposition to a defendant's motion to dismiss. *See Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), *reversed and remanded on other grounds as stated in* 345 F.3d 716 (9th Cir. 2003). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 557 U.S. at 679. The "mere possibility of misconduct" or "unadorned, the defendant-unlawfully-harmed me accusation[s]" fall short of meeting this plausibility standard. *Id.*; *see also Moss*, 572 F.3d at 969.

In addition, factual allegations asserted by *pro se* petitioners, "however inartfully pleaded," are held "to less stringent standards than formal pleadings drafted by lawyers."

8

*Haines v. Kerner*, 404 U.S. 519, 520 (1972). Thus, where a plaintiff appears *pro se* in a civil rights case, the court "must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *See Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 623 (9th Cir. 1988).

### B. John Doe Defendants

Plaintiff's complaint fails to state any claim against John Doe defendants who escorted him and did not have answers to his questions regarding his placement in solitary confinement. He also fails to state a claim against the John Does for whom Plaintiff provides badge numbers and alleges that they did not accept/file his grievance(s). It is undisputed that inmates are not entitled to a specific grievance procedure and that mishandling of grievances fails to state a claim. *See Ramirez v. Galaza,* 334 F.3d 850, 860 (9th Cir.2003). Nor is leave to amend appropriate for these claims. This is Plaintiff's TAC, representing the fourth attempt at pleading, and he fails to state any facts that plausibly suggest any cognizable claim against any John Doe. *Iqbal*, 557 U.S. at 679.

It is **RECOMMENDED** that all John Doe defendants be **DISMISSED WITHOUT LEAVE TO AMEND**.

### C. Eighth Amendment Violations Based on Conditions of Confinement

Defendants argue Plaintiff fails to state an Eighth Amendment claim based on conditions of confinement, and specifically sleep deprivation, because the noise he complains of either (1) had valid penological purposes, such as the lighting schedule and cell counts, (2) was beyond the control of the officers, such as noise created by mentally ill inmates, and (3) was incidental to prison life and a routine part the duties and obligations of the deputies, such as cell counts, breakfast, and razor drop-off/pick-up. ECF No. 67-1 at 16-20.

#### *1. Lighting*

Plaintiff alleges there is constant illumination at SDCJ. The lights are set to high bright starting at 7:00 a.m. and are continuously on until approximately 1:00 a.m. when

the deputies complete razor pick-up.  The lights are then set to "low dim" from 1:00 a.m. until the count at 3:30 a.m.  From 3:30 a.m. to 4:30 a.m. the lights return to high bright for count and breakfast, and then are switched back to low dim from 4:30 a.m. until 7:00 a.m. TAC at 19-20, ¶ 85.  Plaintiff alleges that he can only sleep during the time the lights are dimmed.  *See* TAC at 21, ¶ 85 ("…Plaintiff can only sleep, at most, from 1:00 a.m. to 3:30 a.m. (2 ½ hours) and 4:30 a.m. to 7:00 a.m. (2 ½ hours)…").

Constant high-bright lighting without a legitimate justification has been found to be an Eighth Amendment violation when there is no legitimate justification for constant, high-bright illumination.  *LeMaire v. Maass*, 745 F. Supp. 623, 636 (D. Or. 1990), *vacated on other grounds*, 12 F.3d 1444 (9th Cir. 1993) ([t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional."); *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), *amended by* 135 F.3d 1318 (9th Cir. 1998) (same).  However, use of low-wattage dimmed lighting for a portion of the day where there is a non-punitive, legitimate penological purpose is acceptable.  *Hampton v. Ryan*, No. CV 03-1706-PHX-NVW, 2006 WL 3497780, at *35-37 (D. Ariz. Dec. 4, 2006) *aff'd*, 288 Fed. Appx. 404 (9th Cir. 2008) (unpublished) ("The 24-hour lighting is not punitive in nature, and the evidence demonstrates that the 24-hour cell lighting, which is dimmed at night, does not deprive Plaintiff of the minimal civilized measure of life's necessities."); *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1015 (S.D. Cal. 2006), *aff'd in part*, 393 Fed. Appx. 513 (9th Cir. 2010) (unpublished) ("[c]ontinuous low-wattage lighting may therefore be permissible where it is based on legitimate prison security concerns.")

Here, Defendants offer a valid, non-punitive, purpose for continuous lighting:  to permit deputies to monitor inmates during the night.  ECF No. 67-1 at 20.  The lights are set to low-dim for at least five hours a night.  Plaintiff does not allege that the lights are at constant high-bright level, and does not allege that he cannot sleep for the five hours

when the lights are set to low-dim.  TAC at 21, ¶ 85.  Under the facts alleged, Plaintiff fails to state a claim related to the lighting schedule at SDCJ.[5]

## 2. Excessive Noise

Plaintiff's claim for Eighth Amendment violation is also based in part upon noise complaints that disturbed and/or prevented Plaintiff's sleep.  TAC at 16, ¶ 71; 19-21. These complaints include noise from (1) other inmates characterized by the Plaintiff as "mentally ill" that includes screaming and yelling; (2) noise created by the officers who participated in razor drop-off and pick-up, conducted through slots in the cell door, in an excessively loud manner, and (3) noise from the television set at a high volume.

The Eighth Amendment requires "that [inmates] be housed in an environment that, if not quiet, is at least reasonably free of excess noise."  *Keenan*, 83 F.3d at 1091 (alteration in original) (quoting *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1397 (N.D. Cal. 1984), *aff'd in part, rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986)). In *Keenan*, the court determined the plaintiff had produced sufficient evidence to state an issue of material fact because he alleged "that at all times of day and night" inmates "were screaming, wailing, crying, singing, and yelling" and there was "a constant, loud banging" for a period of six months.  *Id.* at 1090.  Similarly, the court in *Toussaint* found that an "unrelenting, nerve-racking din" constituted excess noise such that it violated the inmate's Eighth Amendment rights.  597 F. Supp. at 1397-98; *but see Mendoza v. Blodgett*, No. C-89-770-JBH, 1990 WL 263527, at *2, 5 (E.D. Wash. Dec. 21, 1990) (holding that the prisoner's one night without sleep did not rise to the level of a constitutional violation). *See also Grizzle*, 2018 WL 1603212, at *5.

///

///

---

[5] The same lighting schedule at SDCJ was recently analyzed by Judge Sammartino in *Grizzle v. County of San Diego,* 17-CV-813-JLS (PCL), 2018 WL 1603212, at *3 (S.D. Cal. Apr. 3, 2018).  The Court finds no reason to depart from Judge Sammartino's analysis and conclusion regarding this identical issue.

### a) Noise from Other Inmates

Plaintiff in this matter only broadly alleges that he "complained to [several defendants] about being housed with mentally ill inmates who bang, yell, [and] scream," but does not allege how often this occurred, how often it disrupted his sleep, or that the noise was constant. TAC at 21, ¶ 86. Plaintiff's TAC focuses more on the destructive behavior of the mentally ill inmates that "destroy the dayroom phone and shower area" than noise created by the inmates, but does not specify that the noise is at night or that it interrupts his sleep. *See* TAC at 21-22, ¶ 86.

Plaintiff's allegations do not state an Eighth Amendment violation based on noise from the mentally ill inmates. *See Keenan*, 83 F.3d at 1090 (alleging "that at all times of day and night" inmates "were screaming, wailing, crying, singing, and yelling" and there was "a constant, loud banging" for a period of six months); *see also Grizzle*, 2018 WL 1603212, at *5 (reviewing nearly identical facts and allegations and concluding that noise from other inmates fails to state a claim).

### b) Noise Created by the Officers – Razor drop-off/pick-up

Plaintiff alleges that razor drop-off occurs nightly at midnight, and razor pick-up is about an hour later at 1:00 a.m. TAC at 19-20, ¶ 85. Plaintiff alleges that many of the defendants purposefully opened and "slam[med] shut" the tray slot door during this process waking him or causing Plaintiff to be unable to sleep. TAC at 20, ¶ 85. Plaintiff asked each deputy "not to let the tray slot fall open and slam them shut due to the high noise it causes and the fact it wakes Plaintiff up," but the deputies proceeded in an "unnecessar[ily] loud manner" despite his requests. *Id.* Plaintiff also alleges he filed grievances and spoke to Lieutenants and Sergeants[6] with the "authority to order razors passed out prior to midnight and to open and shut the tray slots when doing so quietly,"

---

[6] Plaintiff identifies Lieutenants K. Kamoss, Lovelace, Goings, and Sergeants Brewer, Johns, Navarro and Fowler.

and informed each of the "devastating effects the sleep deprivation was having on him" but that the Lieutenants and Sergeants took no action. *Id.* at 21, ¶ 86. Plaintiff also alleges that in response to one grievance he was informed that "policy requires razors be done at between 2200 and 2245 hours."[7] TAC at 25, ¶ 95. Defendants argue that the Plaintiff fails to state a claim against any defendants because he fails to adequately allege the personal participation of the defendants in a civil rights violation, and that any sleep deprivation the Plaintiff suffered was incidental to his incarceration. ECF No. 67-1 at 17-18.

The Ninth Circuit recognizes that sleep deprivation can present a violation of an inmate's constitutional rights. *Keenan*, 83 F.3d at 1090; *see also Matthews v. Holland*, No. 1:14-CV-01959-SKO (PC), 2017 WL 1093847, at *8 (E.D. Cal. Mar. 23, 2017) (denying a motion to dismiss, held "[i]t has been clearly established in the Ninth Circuit, since the 1990s, that inmates are entitled to conditions of confinement which do not result in chronic, long term sleep deprivation."). The right is sufficiently well established that "[o]fficials who cause sleep deprivation are not entitled to qualified immunity." *Rico v. Beard*, 2:17CV1402 KJM DBP, 2018 WL 3702310, at *9 (E.D. Cal. Aug. 2, 2018).

In *Rico v. Beard*, a case currently pending in the Eastern District of California, the plaintiff alleged individual deputies caused sleep deprivation in violation of the Eighth Amendment by participating in checks pursuant to the "Guard One" policy[8] on an hourly basis throughout the night, each night, in an unnecessarily loud manner for the five

---

[7] 2000 and 2045 translate to 10:00 p.m. and 10:45 p.m.

[8] "The Guard One system was designed to reduce inmate suicides by confirming that officers have checked inmates to make sure they are alive and 'free from obvious injury.' [] The system requires officers to strike a metal button on each cell in the SHU with a metal rod. [] To do so, officers must open and close the metal doors to each pod of cells in the SHU. [] Opening and closing the doors makes a loud noise. [] Officers at PBSP conducted these checks at night every half hour until December 2015 when officers were required to check once an hour. [] They continued the checks every half hour during the day. []" *Rico*, 2018 WL 3702310, at *1 (internal citations omitted).

months plaintiff was incarcerated in the Security Housing Unit at Pelican Bay State Prison. 2018 WL 3702310, at *1, *11-12 (E.D. Cal. Aug. 2, 2018). Magistrate Judge Barnes found the actions allegedly taken by the deputies, such as "[r]unning through the pods, allowing the pod doors to slam shut, and striking the metal buttons with the metal rods more forcefully and frequently than necessary can be construed as intentional acts," and stated a claim. *Id.* at *12.

Thus, deputies that cause hourly sleep interruption, even pursuant to a policy in place at the prison supported by a valid penological purpose, in an excessively loud manner on an intentional basis may have participated in a constitutional violation. Here, Plaintiff alleges that the deputies identified[9] conducted razor drop-off and pick-up in an intentionally, excessively loud manner. Standing alone, two interruptions from noisy razor drop off and pick up likely does not state a constitutional violation; but the allegations of the complaint establish more. Plaintiff's TAC establishes the schedule at SDCJ, which the deputies participated in, and that Defendants broadly argue has a valid penological purpose.[10] *See* ECF No. 67-1 at 18-19. However, with knowledge of the schedule, the deputies are aware there is a count at 11:00 p.m., a count at 3:30 a.m., breakfast at 4:00-4:30 a.m., and that the "day" generally starts at 7:00 a.m. when the television is turned on. In light of these facts, deputies that intentionally engage in razor drop off and pick up at a time that is later than the policy permits, in an excessively loud manner, add two additional sleep interruptions to an already fractured pattern that—at best—would provide four and a half hours of uninterrupted sleep between 11:00 p.m. and

---

[9] Plaintiff identifies deputies: Oliver, Cole, McKenny, Cerda, Warren, Stratham, Epps, Mondragon, Barrios, Camlleri, JD Williams, Moon Gallegas, Bullock, Vargas, Zepeda, F. Gonzalez, White, Ramos, De la Cruz, Huerta, M. Ellsworth, Bass, Olsen, Mendoza and Agnew. TAC at 20.

[10] Plaintiff also alleges that in response to his grievance he was informed that, per policy, razor drop-off and pick-up were to occur at "2200 -2245," which translates to between 10:00 and 10:45 p.m. This supports a further inference that departure from the schedule was intentionally designed to interrupt the inmates' sleep.

3:30 a.m.  As Plaintiff alleges, due to the schedule and conditions, "Plaintiff can only sleep, at most, from 1:00 a.m. to 3:30 a.m. and 4:30 a.m. to 7:00 a.m."  TAC at 21.

Accepting as true the Plaintiff's allegations that deputies, individually, acted in a manner that created excessive noise and continued to do so despite his requests and grievances at times that depart significantly from the schedule supports the reasonable inference that the deputies' actions were intentionally designed to interrupt the inmates' sleep, and/or deliberately indifferent, and satisfy the requirement for personal participation in a constitutional deprivation.  The Plaintiff has stated a claim against both the individual deputies and the Sergeants and Lieutenants who he alleges had authority to alter the procedures, were informed of the sleep deprivation, and failed to address the problems.  *Rico v. Beard*, 2018 WL 3702310, at \*10-11.[11]

The undersigned **RECOMMENDS** the motion to dismiss be **DENIED** as to these claims.

### c)  Noise from Television

Plaintiff alleges that the noise from the television contributes to his sleep deprivation because the deputies turn on the television starting at 7:00 a.m. and "set the volume, turn it on extremely loud making sleep no longer possible."  TAC at 20, ¶85; *see also* TAC at 17, ¶ 70.  The televisions are turned off at 9:45 p.m.  week nights, and 10:45 p.m. on Friday/Saturday, to which Plaintiff does not state any objection.

The turning on of the television at a high volume does not state an Eighth Amendment violation.  Despite Plaintiff's allegations that the volume is set too high and that he requested it be set at a "respectful level," it appears that the TV is shared.  While Plaintiff may prefer a lower volume, presumably the volume is set so all the inmates can hear the television, and is only on during daytime hours.  Plaintiff fails to state a claim related to the television volume.  There are four defendants, Deputies Seely, Simms,

---

[11] Plaintiff may only proceed against these Defendants in their individual capacities.

Gardner, and De la Torre, who are only identified in the TAC for their setting of the television volume.  As no other allegations are alleged against them (*see* TAC at 21, ¶ 86), and because Plaintiff has already had several attempts to amend his pleading, the undersigned **RECOMMENDS** defendants Deputies Seely, Simms, Gardner, and De la Torre be **DISMISSED WITHOUT LEAVE TO AMEND**.

### 3.  Municipal Liability

Defendants' only argument against municipal liability is that Plaintiff's allegations are "conclusory and threadbare," relying on Plaintiff's over-use of the word "policy" throughout the complaint.  ECF No. 67-1 at 14.  Reviewing the complaint, Plaintiff alleges that the schedule, and particularly the razor drop-off and pick-up, occur pursuant to an SDCJ policy and that despite grievances, complaints, requests, and letters, remained unchanged during his 150 days at SDCJ.  TAC at 19-21, ¶¶ 84-86; 23 at ¶ 89; 24 at ¶ 93; 24-25 at ¶ 95; 27 at ¶ 106.

A municipality may be liable under § 1983 for deprivations of constitutional rights resulting from their formal policies or customs or as the result of a pervasive practice. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *City of Canton, Ohio v. Harris,* 489 U.S. 378, 387 (1989).  A municipality cannot be held liable under § 1983 "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell,* 436 U.S. at 691 (emphasis original); *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior.").  Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell*, 436 U.S. at 694; *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("[I]t is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible").  Plaintiff must establish that "the local government had a deliberate policy, custom, or

practice that was the moving force behind the constitutional violation [they] suffered."

*AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012)

(citing *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007)).

A "policy" is a "deliberate choice to follow a course of action...made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008); *Long*, 442 F.3d at 1185.

> There are three ways to show a policy or custom of a municipality: (1) by showing 'a longstanding practice or custom which constitutes the standard operating procedure of the local government entity'; (2) 'by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision'; or (3) 'by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.'"

*Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008) (quoting *Ulrich v. Cty. & Cnty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)). A policy "need only cause [the] constitutional violation; it need not be unconstitutional per se." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994) (citations omitted); *see also Koistra v. Cnty. of San Diego*, 310 F. Supp. 3d 1066, 1085 (S.D. Cal. 2018).

The Ninth Circuit held "*some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone.' But this only applies when the conditions 'have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Chappell v. Mandeville*, 706 F.3d 1052, 1061 (9th Cir. 2013) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304, (1991) (emphasis in original).) Justice Berzon, writing separately, went further to identify sleep as a single basic need worthy of Eighth Amendment protection. *Id.* at 1070 (Berzon, J. dissenting in part) ("clearly established

law that conditions having the mutually reinforcing effect of depriving a prisoner of a single basic need, such as sleep, may violate the Eighth Amendment."); *see also, Rico*, 2018 WL 3702310, at *9 (collecting citations for "well-established Ninth Circuit law [that] holds that sleep deprivation may violate the Eighth Amendment").

Plaintiff's allegations establish a schedule for inmates in solitary confinement, in combination with the razor drop-off and pick up inexplicably occurring at midnight and 1:00 a.m., the lighting schedule, noise from other inmates and the television, all of which he alleges occurred throughout his 150 days in solitary confinement. This period of time, 150 days, is a sufficient to support "a longstanding practice or custom which constitutes the standard operating procedure." The facts alleged regarding the conditions support that their combined effect had the mutually reinforcing effect of depriving Plaintiff of sleep. While individually the conditions may not rise to the level of constitutional violations (e.g., Defendants offered a legitimate penological purpose for lighting, and television volume and sounds from other inmates may be acceptable and/or beyond the control of the County), in combination, they plausibly suggest sleep deprivation. Defendants have offered no legitimate purpose for the decision to pass out and pick up razors, offering two separate sleep interruptions, during the time that inmates would otherwise be permitted to sleep, and do not appear to have taken any action in response to Plaintiff's requests, grievances, or letters regarding the conditions. Accepting the allegations as true, and construing them in the Plaintiff's favor, the conditions in solitary confinement alleged by Plaintiff to be the standard operating procedure combined to have the mutually enforcing effect of depriving the Plaintiff of sleep. Plaintiff alleges he filed grievances and wrote to the Sheriff providing actual notice of these conditions. Plaintiff has alleged sufficient facts to survive a motion to dismiss and proceed to discovery as to the official written policies as well as customs, practices, and operations in place at SDCJ related to scheduling and noise. It is **RECOMMENDED** the motion to dismiss the County of San Diego be **DENIED**.

///

### 4. *Sheriff Gore*

Defendants argue that Sheriff Gore cannot be held individually liable for claims arising under § 1983 because he did not personally participate in any of the alleged violations, and any notice provided to him via Plaintiff's letter does not "equate to Sheriff Gore having direct knowledge" of the conditions and policies of which Plaintiff complained. ECF No. 67-1 at 12. Defendants also argue that Sheriff Gore being named in his official capacity is duplicative of naming the County of San Diego. Plaintiff's opposition argues that he sufficiently pleaded facts that gave Sheriff Gore notice of the conditions he alleged amount to constitutional violations and Sheriff Gore failed to take corrective action. ECF No. 73 at 5-6. Plaintiff argues he has stated a claim against Sheriff Gore in his individual capacity as a supervisor. ECF No. 73 at 8.

Personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law" and official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal quotations omitted). Because of the recommendation that the claim against the County survive, the claims against Sheriff Gore in his official capacity are duplicative and the undersigned **RECOMMENDS** the motion to dismiss Sheriff Gore in his official capacity be **GRANTED**.

As to personal capacity based on supervisory liability, a "defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011) (quoting *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989)). "The requisite causal connection can be established … by setting in motion a series of acts by others … or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* (internal alterations omitted) (citing *Dubner v.*

*City & Cnty. of San Francisco,* 266 F.3d 959, 968 (9th Cir. 2001)). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.1998) (internal alteration and quotation marks omitted).

Plaintiff does not offer any allegation of Sheriff Gore's personal involvement, leaving liability dependent upon Sheriff Gore's supervisory role. Plaintiff alleges that he sent a letter to Sheriff Gore informing him of all the conditions contributing to his sleep deprivation as a result of the "policies" at SDCJ including "lights, counts, tray slots, razors, breakfast, television volume, and mentally ill inmates." TAC at 24, ¶ 92. At the pleading stage, this is sufficient to allege Sheriff Gore had knowledge of and refused to terminate the conduct and long-standing schedule that resulted in sleep deprivation. It is **RECOMMENDED** that the motion to dismiss Sheriff Gore in his personal capacity be **DENIED** at this stage of the litigation. *See also Grizzle*, 2018 WL 1603212, at *8 (permitting similar claims to proceed, finding the "constitutional violations in the present case are the lack of outdoor exercise, the timing of recreation time, and Plaintiff not receiving an informal non-adversary hearing within a reasonable time after he was placed in administrative segregation. Plaintiff alleges these violations are due to the policies put in place by Sheriff Gore and that he put Gore on notice of the violations. []The Court finds Plaintiff has sufficiently pled that supervisory liability exists for Sheriff Gore.")

### D. Fourteenth Amendment Due Process Violation based on Placement in Administrative Segregation

Defendants do not specifically argue that Plaintiff's due process claim should be dismissed, but instead focus on the administrative grievances related to placement and failure to identify an appropriate defendant. ECF No. 67-1 at 16, 22. The Court agrees that the handling of grievances does not state a claim, but finds these allegations are properly included in the complaint to demonstrate exhaustion of remedies.

Plaintiff further alleges that he was placed in solitary confinement immediately upon his transfer to SDCJ, without notice or a hearing, and that despite his requests and grievances, he was never given a reason for his placement in solitary confinement or a hearing of any kind.  TAC at 19, ¶¶ 82-84.  Plaintiff remained in solitary confinement for 150 days despite SDCJ policy that permits only 10 days of disciplinary segregation.  TAC at 19, ¶ 83.

Plaintiff adequately alleges facts to support a liberty interest related to his placement in solitary confinement.  TAC 14-19; *see also* Section III (Motion to Strike).  He alleges his confinement was 150 days and indeterminate in nature, ceasing only due to his acceptance of a plea bargain.  TAC at 19, ¶ 82-84.  He alleges constant illumination, though dimmed for 5 hours nightly; exercise only in a small indoor room and not often; limited visitation and contact with other inmates; unsanitary conditions; and excessive noise.  *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (finding liberty interest in inmates' desire to avoid factually similar conditions of confinement, though at different facilities).  Plaintiff alleges that he was ineligible for work or education programs that might inure him good time credits affecting his parole.  TAC at 14-19.  Plaintiff's allegations establish a liberty interest.

Having established a liberty interest, Plaintiff alleges that he was denied procedural protections the Due Process Clause requires by Sheriff Gore, the County of San Diego, and the individual deputies that make up the classification committee.  *See Ramirez,* 334 F.3d at 860 ("If the hardship is sufficiently significant, then the court must determine whether the procedures used to deprive that liberty satisfied Due Process.").  Plaintiff alleges he was denied a hearing of any kind and placed in solitary confinement immediately upon transfer.  Accordingly,

> Plaintiff should have received (1) an informal, nonadversary hearing within a reasonable time after being placed in administrative segregation for administrative purposes, (2) a written decision describing the reasons for placing him in administrative segregation, and (3) an opportunity to present his

view. *Toussaint*, 801 F.2d at 1100. Plaintiff did not receive any of these recognized rights upon being placed in administrative segregation. The Court finds the denial of an informal, nonadversary hearing within a reasonable time after administrative segregation is a constitutional violation.

*Grizzle*, 2018 WL 1603212, at *2.

### 1. Sheriff Gore

Plaintiff alleges Sheriff Gore is the "head of the organization that runs the San Diego County Jail system," and was the Sheriff at the time of Plaintiff's transfer. TAC at 9, ¶ 7; 14 at ¶ 59. Plaintiff's complaint also alleges he wrote a two page letter to Sheriff Gore regarding "sleep deprivation" and "denial of grievances on the issue." *See* TAC at 24, ¶ 92. But Plaintiff does not allege that his letter to Sheriff Gore addressed or mentioned placement in administrative segregation without a hearing. TAC at 24-25, ¶¶ 92, 96. Thus, there is no allegation that Sheriff Gore was provided actual notice of due process violations, which precludes holding Sheriff Gore liable for in his individual capacity in a supervisory role. It is **RECOMMENDED** this claim be **DISMISSED** as to Sheriff Gore.

### 2. County of San Diego

To hold the County of San Diego liable for a constitutional violation, a plaintiff must establish either "(1) a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official government policy"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Grizzle v. County of San Diego*, 17-CV-813-JLS (PCL), 2018 WL 3689153, at *5-6 (S.D. Cal. Aug. 3, 2018) (*citing Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)).

Here, the second and third factors are quickly eliminated because Sheriff Gore is the "official with final policy making authority" and there are no allegations that plausibly suggest Sheriff Gore either "committed the constitutional tort" by placing the Plaintiff in solitary confinement without a hearing, or expressly ratified that decision or the basis for it. *See id.*

Addressing the first factor, the factual allegations in the present complaint call into question whether or not placement in solitary confinement upon transfer without a hearing was "standard operating procedure" at SDCJ. First, Plaintiff alleges that in a prior visit to SDCJ in 2008 he was placed in solitary confinement immediately upon arrival. TAC at 13, ¶ 55. While Plaintiff does not have any claims related to his prior transfer, there are no allegations he was provided any sort of hearing at that time; instead he alleges he was informed his placement at SDCJ simply matched his placement at CDCR at the time of transfer. *Id.* at ¶ 56. Plaintiff then alleges in 2016, upon his transfer from general population at CDCR to SDCJ, he was again immediately placed in solitary confinement without a hearing. *Id.* at 14, ¶¶ 59-61. Plaintiff then filed inmate requests with the classification department and then grievances related to his placement seeking an explanation or hearing. TAC at 14, ¶¶ 62- 63. Sgt. Lawson responded to the grievance, but refused to provide a reason for his placement or a hearing despite the grievance alerting him to its procedural absence. *Id.* at 13-14, ¶ 64. When attempting to file another grievance months later regarding his placement, Plaintiff alleges that he was informed by a deputy that "housing decisions are not grievable." TAC at 25, ¶ 96. Plaintiff alleges that he replied "I am being denied my due process rights," to which the deputy responded, "I'll take it, but they're just going to throw it away." *Id.*

These facts, construed liberally and in Plaintiff's favor, coupled with at least one other occurrence (*see generally, Grizzle,* 2018 WL 1603212 and 2018 WL 3689153), plausibly suggest an unofficial policy and practice of failing to provide hearings for those placed in solitary confinement upon transfer. That a deputy felt confident enough in the practice to inform the Plaintiff that his grievance regarding placement in segregation was

(1) not subject to grievance and (2) would be thrown away, supports the inference that there was a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity" to deny hearings such as those required under *Touissant*. Here the facts support a claim against the County based on the standard operating procedures at SDCJ that do not provide inmates hearings related to decisions to house inmates in administrative segregation following transfer, including placement in solitary confinement for an extended or indeterminate period of time.[12]

Plaintiff's allegations state a claim against the County of San Diego for Fourteenth Amendment Due Process violations. It is **RECOMMENDED** the motion to dismiss be **DENIED** as to this claim.

### *3. Individual Defendant Members of the Classification Committee*

In light of the plain constitutional requirements that notice and an explanation for placement in administrative segregation must be provided to the inmate, and the lack of any requirement of a finding of deliberate indifference to state a violation of the Fourteenth Amendment, the Plaintiff states a claim against Sgt. Lawson. Here Sgt. Lawson is alleged to have notice via Plaintiff's inmate requests and grievances that Plaintiff did not receive required, well-established, constitutional due process in the form of "an informal nonadversary hearing within a reasonable time after the prisoner is segregated," "inform[ing] the prisoner of the charges against the prisoner or their reasons for considering segregation" and "allow[ing] the prisoner to present his views." *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986).

---

[12]  Even if the placement was for disciplinary reasons (which it is not alleged to be), Due Process still requires procedural protections including: (1) written notice of the charges at least 24 hours before the disciplinary hearing; (2) a written statement by the fact-finder of the evidence relied on and reasons for the disciplinary action; (3) the right to call witnesses and present documentary evidence if doing so will not jeopardize institutional safety or correctional goals; (4) the right to appear before an impartial body; and (5) assistance from fellow inmates or prison staff in complex cases. *Wolff v. McDonnell*, 418 U.S. 539, 563-72 (1974). The complaint clearly alleges Plaintiff was not provided a hearing or written explanation of any kind upon his placement from transfer.

The allegations do not establish actual notice to any other member of the classification committee, and Plaintiff has had three prior opportunities to amend his complaint. Accordingly, it is **RECOMMENDED** that Lt. Smith, Sgt. Froisted; Deputy Price, Deputy Leon, Deputy Bravo, Deputy Hernandez and Deputy Rios be **DISMISSED WITHOUT LEAVE TO AMEND**, but that Plaintiff's claims proceed against Sgt. Lawson in his individual capacity and the County of San Diego.

### E. Eighth Amendment Denial of Outside and Out-of-Cell Exercise

Plaintiff alleges that he was denied access to outdoor recreation for the entirety of his time at SDCJ (150 days), and that beginning February 7, 2017 until the time he transferred on May 17, 2017 (99 days), he was denied access to any out-of-cell exercise.[13] TAC at 25, ¶¶ 97-100.

"Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation." *Keenan*, 83 F.3d at 1089; *see also Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir. 1979) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates."). The Ninth Circuit previously found a prisoner had sufficiently stated a constitutional violation when the prisoner had been denied all outdoor exercise for a period of forty-five days. *Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000). Here, Plaintiff's allegations establish he was denied outdoor and out-of-cell exercise for a significantly longer period of time. *See also Grizzle*, 2018 WL 1603212, at *7 (permitting Eighth Amendment claim to proceed on similar facts).

---

[13] M.R. Mesa is identified once in the TAC as the deputy to whom Plaintiff handed his grievance regarding lack of out-of-cell exercise. TAC at 26, ¶ 103. No other allegations involve M.R. Mesa, and mishandling of grievances fails to state a claim. *See Ramirez v. Galaza,* 334 F.3d 850, 860 (9th Cir.2003). The undersigned RECOMMENDS Deputy M.R. Mesa be DISMISSED WITHOUT LEAVE TO AMEND.

As with the Plaintiff's allegations regarding the schedule, three and five months are sufficient periods of time to establish an accepted policy, practice, and/or standard operating procedure at SDCJ to maintain a cause of action against the County for denial of outdoor and out-of-cell exercise. Likewise, Sheriff Gore, as the relevant policy-maker, had actual and constructive notice that there was no outdoor exercise available for the inmates in solitary confinement as the only out-of-cell exercise room at SDCJ is alleged to be in an "indoor rec-yard." TAC at 25, ¶ 98. The allegations adequately state a claim against the County of San Diego.

However, the allegations regarding out-of-cell exercise do not allege claims against individual deputy defendants. For both outdoor and out-of-cell exercise, Plaintiff validly alleges he was deprived this constitutional right, but not that any of the individual deputy defendants identified was personally involved in the deprivation by an "affirmative act, participat[ing] in another's affirmative acts, or omit[ting] to perform an act which he is legally required to do." *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978). The allegations simply state that Plaintiff requested yard access, verbally or in writing, to various defendants and that no action was taken by any defendant in response. TAC at 25-26 at ¶ 101; 29 at ¶ 113. Inaction in response to complaints without any personal participation does not satisfy the deliberate indifference standard. *Yasin v. Flynn*, 17-cv-01057-BAS-JLB, 2017 WL 5495097, at *9 (S.D. Cal. Nov. 16, 2017) (finding the mere fact that defendants did not respond to the prisoner's complaints did not rise to the level of deliberate indifference); *see also Grizzle,* 2018 WL 1603212, at *3 (finding no personal participation showing deliberate indifference for individual deputy defendants for denial of outdoor exercise); *Hatter v. Dyer*, 154 F. Supp. 3d 940, 944 (C.D. Cal. 2015) (finding mere inaction alone was insufficient to show deliberate indifference to overcrowding).

### F. Eleventh Amendment Immunity & Injunctive Relief

Pursuant to 28 U.S.C. §§ 1915a and 1915(e)(2)(B), the Court must dismiss any complaint if at any time the Court determines that it "seeks monetary relief against a

defendant who is immune from such relief." The Eleventh Amendment generally bars claims for damages against state officials acting in their official capacities. *Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir. 2016); *Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010); *Pena v. Gardner*, 976 F.2d 469, 472 (9th Cir. 1992), *as amended* (Oct. 9, 1992) (per curiam) ("It is thus clear that the eleventh amendment will bar [the prisoner] from bringing his claims in federal court against the state officials in their *official* capacities. It will not, however, bar claims against the state officials in their *personal* capacities.") (emphasis in original).

There is a narrow exception to this rule when state officers are sued in their official capacities and a plaintiff seeks only a declaratory judgment or injunctive relief. *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 989 (9th Cir. 2014) (citing *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982)). If a prisoner challenges conditions of confinement and seeks injunctive relief, his transfer to another prison renders the request for injunctive relief moot absent evidence of an expectation of being transferred back. *See Preiser v. Newkirk*, 422 U.S. 395, 402-03 (1975); *Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam); *see also Andrews v. Cervantes*, 493 F.3d 1047, 1053 n.5 (9th Cir. 2007).

Here, Plaintiff sues all the individual Lieutenants, Sergeants, and Deputies named as defendants in both their official and individual capacities. *See* TAC at 9-13, ¶¶ 7-52. To the extent Plaintiff seeks damages against any defendants in their official capacities, his claims are barred by the Eleventh Amendment. *See Mitchell*, 818 F.3d at 442; *Pena*, 976 F.2d at 472; *Dittman*, 191 F.3d at 1025-26.

Additionally, part of the relief requested by Plaintiff is injunctive relief seeking specific direction applicable to the conditions at SDCJ, such as "order defendants to provide Plaintiff with a minimum of eight hours of sleep each night" and "cease passing out razors after 11:00 p.m." TAC at 32. However, the complaint also establishes Plaintiff is no longer incarcerated at SDCJ, having "transferred from SDCJ back to

CDCR" on May 17, 2017.  TAC at 9, ¶5; 22, ¶ 87. The TAC does not establish any expectation that Plaintiff will be transferred back to SDCJ.

Thus, to the extent Plaintiff seeks injunctive relief, his requests are rendered moot by his transfer.  Plaintiff may only proceed with his claims to the extent they seek damages.  *See Rico*, 2018 WL 3702310, at *8 ("[i]f plaintiff's claims for injunctive and declaratory relief are moot, then plaintiff's official capacity claims against defendants should be dismissed. … Therefore, only plaintiff's claims for damages remain.").

The undersigned recommends the claims against all individual defendants in their official capacities be **DISMISSED WITHOUT LEAVE TO AMEND** and that Plaintiff's requests for injunctive relief be **DENIED AS MOOT**, and he only be permitted to proceed with his claims for damages.

**V.**

**MOTION FOR DISCOVERY**

Plaintiff moves for leave to conduct early discovery to (1) identify and serve named defendants for which his summons was returned unexecuted, (2) to identify defendants currently named as John Does, and (3) obtain policies of the San Diego County's Sheriff's department.  ECF No. 74 at 2.  Specifically, Plaintiff asks for production of the employment records for deputies who the Sheriff's department had more than one potential defendant with the same last name; contact information for those who the Sheriff's department stated there were no employees with that name; the names of deputies for which Plaintiff only has a badge number; and the names of deputies assigned to control booths in the housing units where the Plaintiff was assigned.  *Id.* at 5.

Defendants oppose on the grounds that permitting early discovery is a waste of resources and taxpayer funds because Plaintiff's complaint will not survive a motion to dismiss.  ECF No. 80.  Defendants also argue the requests are overbroad in seeking all department employees' records with the same last name as those identified by Plaintiff. *Id.* at 2, 4.

///

## A. Legal Standards

In a civil rights action brought by a prisoner without the assistance of counsel, early discovery is available in certain circumstances. The Ninth Circuit permits discovery "'where the identity of the alleged defendant is not known prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds.'" *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (quoting *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)); *see also Coreno v. Hiles*, 09-cv-2504 LAB POR, 2010 WL 2404395, at *3 (S.D. Cal. June 14, 2010). Similarly, discovery is permitted when necessary to complete service. *Lal v. Felker*, 2:07-CV-2060-KJM-EFB, 2015 WL 1530491, at *2 (E.D. Cal. Apr. 3, 2015), *report and recommendation adopted*, 2:07-CV-2060-KJM-EFB, 2015 WL 3469144 (E.D. Cal. June 1, 2015) (detailing history of discovery permitted for prisoner pro se plaintiff to obtain information necessary to serve plaintiff).

## B. Discussion

Discovery is not permitted as to John Does and other unserved defendants that do not survive the motion to dismiss (Lt. Smith, Sgt. Froisted; Deputies Leon, Bravo, Hernandez Rios, Seely, Sims, Gardner, and De la Torre). *Wakefield v. Thompson*, 177 F.3d at 1163. In this regard, Plaintiff's request for leave to conduct early discovery is **DENIED**.

However, because the Court determines that the individual claims against the deputies that participated in or failed to take action regarding excessive noise and sleep disruptions related to razor drop-off and pick-up survive the motion to dismiss, it is appropriate to grant limited discovery to permit the service of these individuals.

The Deputy Attorneys General and the Office of the Attorney General is uniquely situated to work with the litigation coordinator for the Sheriff's office to access the first name/initial of the deputies identified by last name in the Plaintiff's complaint, and for whom the Plaintiff adequately alleges intentional participation in sleep deprivation that

have not yet appeared: Lieutenants Lovelace and Goings; Sergeants Johns, Navarro and Fowler; and Deputies Cole, McKenny, Cerda, Warren, Stratham, Epps, Barrios, Camlleri, Gallegas, Bullock, Vargas, Zepeda, White, Ramos, De la Cruz, Huerta, Olsen, and Mendoza. This solution also addresses the Defendants' concern regarding taxpayer resources as requiring the Deputy Attorneys General to provide this information prevents the discovery of voluminous employee records, and saves taxpayers any additional time and effort that might otherwise fall to the U.S. Marshals Service.[14]  And, because there is no doubt that the Office of the Attorney General will represent each of the deputies identified, any burden associated with identifying the proper defendants within the Sheriff's department would be borne by the AG's office in any event. *See Fletcher v. Quin, et al.,* 3:15-CV-02156-GPC-NLS, 2017 WL 836194, at *5 (S.D. Cal. Mar. 3, 2017) (requiring Deputy AG to provide first initial of each defendant to the U.S. Marshals in a confidential memorandum).

The Deputy Attorneys General assigned to this case are to contact the litigation coordinator at SDCJ for the purposes of determining the defendants involved, and are to provide the first initials for Lieutenants Lovelace and Goings; Sergeants Johns, Navarro and Fowler; and Deputies Cole, McKenny, Cerda, Warren, Stratham, Epps, Barrios, Camlleri, Gallegas, Bullock, Vargas, Zepeda, White, Ramos, De la Cruz, Huerta, Olsen, and Mendoza, to the US Marshals in a confidential memorandum by **14 days** following Judge Hayes's decision on this Report and Recommendation.  The Court also **RECOMMENDS** time be extended to complete service as to these Defendants until **60 days** following Judge Hayes's decision on this Report and Recommendation.

**VI.**

**RECOMMENDATION**

As outlined herein, the undersigned recommends as follows:

---

[14] The Court is particularly mindful that the U.S. Marshals are uniquely extended at present.

1. Defendants' motion to strike be **DENIED**;

2. Defendants' motion to dismiss be **GRANTED IN PART AND DENIED IN PART**:

   a) Plaintiff's Eight Amendment claims regarding sleep deprivation be permitted to proceed against the County of San Diego; Sheriff Gore, Lieutenants K. Kamoss, Lovelace, Goings; Sergeants Brewer, Johns, Navarro and Fowler; and Deputies Oliver, Cole, McKenny, Cerda, Warren, Stratham, Epps, Mondragon, Barrios, Camalleri, JD Williams, Moon, Gallegas, Bullock, Vargas, Zepeda, F. Gonzalez, White, Ramos, De la Cruz, Huerta, M. Ellsworth, Bass, Olsen, Mendoza and Agnew.

   b) Plaintiff's Fourteenth Amendment Claims regarding placement in administrative segregation be permitted to proceed against the County of San Diego and Sgt. Lawson;

   c) Plaintiff's Eighth Amendment claims regarding denial of outdoors and out of cell exercise be permitted to proceed against the County of San Diego;

   d) That the served defendants Lt. Smith, Deputies Hernandez, Rios, and M.R. Mesa be **DISMISSED WITHOUT LEAVE TO AMEND**.

3. Based on the analysis set forth and pursuant to the *sua sponte* screening permitted by 28 U.S.C. § 1915a:

   a) That the presently unserved defendants Leon, Bravo, Rios, Seely, Simms, Gardner, De la Torre, and Froisted, be **DISMISSED WITHOUT LEAVE TO AMEND** from this action by the Clerk, and the Marshals be informed service is no longer required.

   b) That claims against all individual defendants in their official capacities be **DISMISSED WITHOUT LEAVE TO AMEND.**

   c) That Plaintiff's requests for injunctive relief be **DENIED AS MOOT**, and he only be permitted to proceed with his claims for damages.

4. That no discovery be permitted relating to John Doe defendants and they be **DISMISSED WITHOUT LEAVE TO AMEND**.

5. That the Deputy AG find and provide the first initial for defendants: Lieutenants Lovelace and Goings; Sergeants Johns, Navarro and Fowler; and Deputies Cole, McKenny, Cerda, Warren, Stratham, Epps, Barrios, Camlleri, Gallegas, Bullock, Vargas, Zepeda, White, Ramos, De la Cruz, Huerta, Olsen, and Mendoza, to the U.S. Marshals by 14 days following Judge Hayes's decision on this Report and Recommendation, and that time be extended to complete service as to these Defendants until 60 days following Judge Hayes's decision on this Report and Recommendation.

## VII.

## CONCLUSION

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **October 12, 2018**, any party to this action may file written objections and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections must be filed and served on all parties no later than **October 24, 2018.**

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: September 26, 2018

Hon. Nita L. Stormes
United States Magistrate Judge