UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

THOMAS GOOLSBY,

                                    Plaintiff,

        v.

COUNTY OF SAN DIEGO, et al.,

                                    Defendants.

Case No.: 17cv564-WQH (NLS)

**REPORT AND RECOMMENDATION FOR ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[ECF No. 137]

        Before the Court is Defendants' motion for summary judgment.  ECF No. 137.  For the reasons outlined below, the Court **RECOMMENDS** that the district judge **GRANT IN PART AND DENY IN PART** Defendant's motion for summary judgment.

## I.    PROCEDURAL BACKGROUND

        Plaintiff Thomas Goolsby ("Plaintiff"), a prisoner proceeding *pro se* and *in forma pauperis*, filed this civil rights action under 42 U.S.C. § 1983 claiming that Defendants violated his Eighth and Fourteenth Amendment rights stemming from his incarceration at the George Bailey Detention Facility and San Diego County Jail between December 12, 2016 and May 17, 2017.  ECF No. 15 (Third Amended

Complaint). Plaintiff's complaint alleges three claims: (1) lack of Fourteenth Amendment due process in his classification and extended placement in administrative segregation; (2) conditions of confinement that violate his Eighth Amendment rights, specifically, depriving him of sleep; and (3) conditions of confinement that violate his Eighth Amendment rights, specifically, depriving him outdoor exercise.

Defendants filed a motion to dismiss in which the Court granted in part and denied in part. ECF No. 97. The Court dismissed Plaintiff's Eighth Amendment claims regarding conditions of confinement based on sleep deprivation as to all defendants, but permitted him to proceed on his Fourteenth Amendment claims regarding placement in administrative segregation against the County of San Diego and his Eighth Amendment claims regarding denial of outdoors and out of cell exercise against the County of San Diego. *Id.* at 10. All other individual defendants were dismissed from the case. *Id.*

After the close of discovery, Defendant County of San Diego filed a motion for summary judgment. ECF No. 137. The Court notified Plaintiff of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc). ECF No. 138. Plaintiff filed an opposition, Defendant filed a reply, and Plaintiff filed a sur-reply. ECF Nos. 147, 150, 152.

## II.    FACTUAL BACKGROUND

The claims that remain in this litigation center around two events: (1) Plaintiff's placement into administrative segregation when he arrived at San Diego Central Jail in December 2016, and (2) Plaintiff's access to outdoor exercise at the George Bailey Detention Facility and San Diego Central Jail, starting February 7, 2017.

*//*

## A. Administrative Segregation

On December 12, 2016, Plaintiff was transferred from the California Department of Corrections to San Diego County Central Jail. ECF 147 (Goolsby Decl.) at 48, ¶ 5.[1] Plaintiff was issued green clothing and a green wristband. *Id.* at 2, ¶ 6. At some point during Plaintiff's intake and booking process, Deputy Frankie Leon and Plaintiff spoke about Plaintiff's prior housing placements, rules violations, and gang affiliations. *Id.*; ECF 137-5 (Leon Decl.) at 3, ¶ 9. Prior to the conversation, Deputy Leon familiarized himself with Plaintiff's Jail Information System History. *Id.* at 2, ¶ 7. During the conversation, Plaintiff indicated he was previously identified as a gang member by an Institutional Gang Investigator while in Tehachapi State Prison. *Id.* 3, ¶ 10. As a result of Plaintiff's gang verification, a field interview was conducted to document any tattoos. ECF 137-2 (Froistad Decl.) at 5, ¶ 26. Deputy Campos conducted the field interview. ECF 137-2 (Exh. I) at 70-85.

Deputy Leon then drafted a report recommending that the Plaintiff be housed in administrative segregation. ECF 137-2 (Exh. G) at 63-64. Sergeant Rose approved the suggestion the following day. *Id.* Pursuant to Deputy Leon's recommendation, Plaintiff was transferred into administrative segregation. ECF 137-5 (Leon Decl.) at 4, ¶ 14. On December 14, 2016, Plaintiff filed a grievance form contesting his placement in administrative segregation. ECF 137- 2 (Exh. H) at 66-68. The following day, December 15, 2016, Sergeant Lawson received and responded to Plaintiff's grievance. ECF 137–2 (Exh. J) at 87-88. Sergeant Lawson informed Plaintiff he was not deprived of due process or privileges as an inmate in the County of San Diego. *Id.*

---

[1] All page number references use the header generated by CM/ECF. For references to the Plaintiff's Third Amended Complaint in particular, paragraph references are to the paragraphs as numbered by Plaintiff.

### B.  Outdoor Exercise

Plaintiff was housed at the George Bailey Detention Facility during the period of February 7, 2017 to February 27, 2017 and from April 20, 2017 to May 17, 2017.  ECF No. 137-6 (Mendoza Decl.) at 2, ¶ 6.  He was housed in various modules at San Diego Central Jail for the time in between, from February 27, 2017 to April 20, 2017.  *Id.*

Plaintiff alleges and states during his deposition and in his declaration that he never received any out of cell exercise or recreation yard time after February 7, 2017.  ECF No. 15 at ¶ 108; ECF No. 147 (Goolsby Decl.) at 51-52, ¶ 16.  He further states that he never once refused yard time when he was offered.  ECF No. 147 (Goolsby Declaration) at 52, ¶ 17.

Defendant instead presents evidence from Deputy Sheriff Mendoza that Plaintiff was offered a total of 23 days of yard time between February 7 to May 17, 2017, for a total of 46.5 hours, averaging 3.875 hours per week.  ECF No. 137-6 (Mendoza Decl.) at 2-3, ¶¶ 8-13.  Of these offered days, Deputy Mendoza states that Plaintiff started recreation time at least 12 times.  *Id.* at 3, ¶¶ 10-11.

Plaintiff also alleges and states in his deposition and declaration that on March 6, 2017, he filed a grievance regarding his lack of exercise time, which was handed to and accepted by M.R. Meza.  ECF No. 147 (Goolsby Decl.) at 52, ¶ 19; ECF No. 137-2 (Goolsby Dep.) at 39:12-25, 40:21-41:1.  Plaintiff states he did not receive a response to this grievance.  ECF No. 147 (Goolsby Decl.) at 52, ¶ 19; ECF No. 137-2 (Goolsby Dep.) at 41:2-42:6.  Plaintiff also states that later in March or early April 2017, he wrote a letter to Sheriff Gore complaining about the same issue and he also never received a response to this letter.  ECF No. 147 (Goolsby Decl.) at 53, ¶ 24; ECF No. 137-2 (Goolsby Dep.) at 42:7-43:18.

//

//

### III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex. Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party can establish an absence of a genuine issue of material fact by (1) presenting evidence that negates an essential element of the non-moving party's case; or (2) demonstrating that the nonmoving party failed to establish an essential element of that party's case. *Celotex*, 477 U.S. at 322-323. The moving party must identify the pleadings, depositions, affidavits or other evidence that the party "believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 US. 253, 289 (1968)). In making this determination, the court must view the underlying facts in the light most favorable to the party opposing the motion. *Id.* The court should not engage in

credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

## IV. Discussion

### A. Administrative Segregation Placement

Defendant County of San Diego bears the burden of establishing the absence of a genuine issue of material fact and demonstrating its entitlement to judgment as a matter of law. *See Celotex*, 477 at 323. Here, the Defendant fails to satisfy its initial burden. For the reasons explained below, the Court recommends the District Judge deny Defendant's motion for summary judgment as to this claim.

The Fourteenth Amendment provides, "[n]o State shall… deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Prisoners who wish to invoke due process protections must establish the existence of a protected interest and show it was denied without due process. *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). The Constitution itself does not confer on inmates "a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Administrative segregation in and of itself typically does not implicate a liberty interest. *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003).

However, state regulations may create a liberty interest where the nature of the confinement "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[2] *Id.* at 222. In such cases where a liberty interest does exist, due process requires:

> Prison officials must hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated. The prison officials

---

[2] The Court has previously found a sufficient liberty interest in this case, *see* ECF No. 86 at 21, and neither party directly re-raises this issue on summary judgment.

6

must inform the prisoner of the charges against the prisoner or the reasons for considering segregation. Prison officials must allow the prisoner to present his views.

*Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986). Due Process does not require "detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation." *Id.* at 1100–01. Additionally, prison officials must have "some evidence" to support their decision to place an inmate in segregation for administrative reasons. *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003) (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

First, Defendant must demonstrate there is no genuine issue of material fact regarding Plaintiff's due process claims. *See Anderson* 477 U.S. at 247. Defendant asserts no genuine issue of material fact exists because according to Plaintiff's own recitation of events, Plaintiff received the requisite due process protections. ECF 150 at 2-3. As set forth by Defendant, the facts that support granting summary judgment are:

Plaintiff alleges that he spoke with two deputies including Deputy Leon prior to his placement in administrative segregation [Plaintiff Dec. ¶ 6]. He admits these deputies asked him several questions and Plaintiff responded to those questions. *Id.* They allegedly asked whether he was "slammed" in the state [*Id.*] Plaintiff responded no, he was in general population, and that he had CDCR documents to prove it. [*Id.*] Plaintiff had the opportunity to explain that during a previous stay in County custody he was told that if he was housed in general population at the CDCR, he would be in general population while in County custody. [*Id.*] He also told the deputies that he was in segregated housing during a previous stay in County custody due to "bogus gang validations" and rule violations [*Id.*] One of the deputies allegedly replied as long as Plaintiff was truthful[,] he could be housed in general population. [*Id.*] "Very soon" after Plaintiff's placement in administrative segregation, he submitted a grievance [Plaintiff Dec. ¶ 9] … Sergeant Lawson responded to that grievance, and Plaintiff soon

after submitted a second grievance. [NOL Exb. J, Sergeant Lawson's response to Plaintiff's Grievance. [Exb. J]; Plaintiff Dec. ¶ 9.]

*Id.* at 2. From these facts, Defendant concludes "it is undisputed that Plaintiff received the requisite due process protections prior [to] his placement in the administrative segregation unit." *Id.* at 3. Defendant also argues that the Plaintiff had ample opportunities to present his views to jail staff and contest his housing assignment, therefore "the classification evaluation, grievances, and grievance reviews provided an informal non-adversarial process for Plaintiff to contest his ad-seg placement."[3] ECF 137-1 at 13.

Plaintiff argues that Defendant did not provide the requisite due process for multiple reasons. Specific to the informal nonadversary hearing requirement, Plaintiff rejects the Defendant's categorization of the classification evaluation as an informal non-adversary hearing. ECF 147 at 8. Plaintiff also argues the hearing was never held because Plaintiff did not have the opportunity to present his views to the person with ultimate decision-making authority. *Id.* at 8:19–24.

Defendant fails to demonstrate the absence of a genuine issue of material fact. The context of the interaction between Deputy Leon and Plaintiff is material to determining whether a sufficient "informal nonadversary hearing" occurred. On the one hand, Deputy Leon's declaration consistently indicates an "interview" was conducted between himself and Plaintiff before Plaintiff was placed in administrative segregation. *See* ECF 137-5 (Leon Decl.) at 3, ¶¶ 9-11. According to his declaration, he asked a series of questions to Plaintiff, which he answered, and that at the end of the "interview," he told Plaintiff that he would be placed in administrative segregation because of his open admittance to being a member of a prison gang. *Id.* at ¶ 10.

Plaintiff's account does not dispute that there was an interaction between the

---

[3] Defendant cites no case law to support this argument.

8

himself and Deputy Leon but raises questions about the meaningfulness of the interaction and whether Plaintiff was aware that it was the actual classification interview. *See* ECF 150, Pl.'s Decl., at ¶ 6. According to Plaintiff, the conversation occurred when, "I [Plaintiff] was in the middle of stripping out when he [Deputy Leon] came in and stuck his head in the door and said, "Hey, Goolsby, where are you coming from?" ECF 137-2 (Goolsby Dep.) at 35-39. Plaintiff's declaration provides further details on his account of the interaction:

> "I was given green colored jail clothing to dress in. As I was dressing, two deputies came in, one asked me where I was coming from? I told him Kern Valley State prison. He then asked me if I was slammed in the State? I told him no, that I was on the general population yard and had CDCR records with me to prove it. I told him I have been in the past for a bogus gang validation and rule violations and was slammed in County custody in 2008 because of it. But Sgt. Rose told me if I could prove I was mainline in CDCR I can be mainline here. The deputy told me as long as that was true I would be going to mainline here, but he needed to talk to his supervisor who make housing decisions, he can only make recommendations. The other deputy took pictures of my tattoos and they both left."

ECF No. 147 (Goolsby Decl.) at 48, ¶ 6.

The driving force of the requirements under *Touissant* and due process generally is to ensure that a prisoner gets some notice of the reasons why he may be placed in administrative segregation and to ensure he has some opportunity to be heard in opposition. Plaintiff's testimony as to the conversation—which happened while he was changing clothes—raises some questions as to whether the environment and context was sufficient for the inmate to receive the proper notice and opportunity to present his or her view. Even the County Sheriff's Department Jail Population Management Unit Training Manual contemplates a more formal interaction between an inmate and the deputy during the classification interview. *See* ECF 147 (Exh. D) at 102. For example, the manual states, "the inmate will be interviewed in one of the Classification interview booths," that the inmate should

be seated at all times, and not be permitted to touch the interview desk. *Id.*

Taking the evidence in the light most favorable to the Plaintiff, a genuine issue of material fact exists regarding whether an informal nonadversary hearing occurred.[4] It is thus more appropriate for the trier of fact to determine whether the *Toussaint* factors were satisfied. The Court recommends that summary judgment be denied on this claim.[5]

## B. Exhaustion of Administrative Remedies Related to Outdoor Exercise

The County next moves for summary judgment on the issue of whether Plaintiff sufficiently exhausted his administrative remedies as to his recreation yard claims. ECF No. 137-1 at 13-15.

When defendants seek summary judgment based on the plaintiff's failure to exhaust specifically, they must first prove that there was an available administrative remedy and that plaintiff did not exhaust that available remedy. *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (quotation marks omitted). If they do, the burden of production then shifts to the plaintiff "to show that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Williams*, 775 F.3d at 1191; *see also Ross v. Blake*, 136 S. Ct. 1850, 1858-60 (2016). Only "[i]f the undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, [is] a

---

[4] Additionally, Defendant cites to no case law to show that the interaction between the two satisfied the minimum due process required for a prison inmate in this situation.

[5] Defendant filed objections to information in Plaintiff's opposition to the summary judgment motion related to this claim. ECF No. 150-2. First, Defendant objected to Plaintiff's arguments and evidence related to his 2019 stay in county custody because this occurred after the claimed events. *Id.* at 3. Second, Defendant objected to Plaintiff's arguments and evidence related to 7-day reviews because it was not encompassed in the Third Amended complaint. *Id.* at 4. Because the Court does not rely on either of these arguments and evidence in its order, these objections are overruled as moot.

defendant is entitled to summary judgment under Rule 56." *Albino*, 747 F.3d at 1166.

The Prisoner Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e (a). Therefore, exhaustion is "mandatory" before bringing a federal action. *Ross*, 136 S. Ct. at 1856; *see Porter v. Nussle*, 534 U.S. 516, 524 (2002). A prisoner is not required to plead exhaustion in his complaint; it is an affirmative defense that must be raised and proven by a defendant. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

The Supreme Court has "held that to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' []—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) (internal citation omitted)). The exhaustion requirement offers the prison a chance to resolve the issue on its own and "promotes efficiency" by allowing claims to be resolved more quickly than litigation. *Woodford*, 548 U.S. at 90. Thus, a prison's own grievance process, not the PLRA, determines how detailed a grievance must be to satisfy the exhaustion requirement. *Jones*, 549 U.S. at 218.

Grievance procedures are available if they are "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)); *see also Williams*, 775 F.3d at 1191 ("To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'") (quoting *Albino*, 747 F.3d at 1171).

//

11

### i.    Recreation Yard Claims at George Bailey Detention Facility

Plaintiff was housed at George Bailey Detention Facility between February 7, 2017 and February 27, 2017 and April 20, 2017 to May 17, 2018. ECF No. 150 at 7; ECF No. 137-6 (Mendoza Decl.) at 2, ¶ 6. Plaintiff himself does not dispute that he did not file any grievances during this time period as to recreation yard time.[6] ECF No. 137-2 (Goolsby Decl.) at 95:5-19 (Plaintiff testifying at his deposition that he did not file any such grievances). Plaintiff also does not contest this in his opposition brief. Rather, his argument is that he did not do so because no administrative remedies were available to him. ECF No. 147 at 23-25. Specifically, Plaintiff argues that it was Defendant's policy to not respond to grievances, effectively making it futile for him to submit any. *Id.* As evidence of this "policy," Plaintiff cites to several grievances he filed that he claims were never responded to, a letter to Sheriff Gore complaining that his grievances were going unanswered, and declarations from two other prisoners that also complained about grievances going unanswered. *Id.* at 23.

However, even if some grievances were going unanswered, Plaintiff does not cite to any case that would suggest that this excuses him from having to at least attempt to file a grievance in the first place. To the contrary, it appears that Plaintiff did exactly that with the other grievances he filed. Specifically, as discussed below, Plaintiff did file a grievance regarding lack of recreation time when he was placed in San Diego Central Jail after his time at George Bailey. Failing to file grievances in the first place defeats one of the primary purposes of the grievance process—to put the prison on notice of an issue. *See, e.g. Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) ("The primary purpose of a grievance

---

[6] Plaintiff points to several grievances he filed in his opposition, but none cover this issue of recreation yard time at George Bailey. *See* ECF No. 147 at 163 (Ex. N) (dated 2/7/2017 but referring to placement in solitary confinement); *id.* at 201-205 (Ex. S) (grievances dated June and September 2019).

is to alert the prison to a problem and facilitate its resolution.").  Further, at least one court in the Ninth Circuit has rejected similar arguments as the one Plaintiff makes here with regard to a widespread policy of not handling grievances properly excusing the exhaustion requirement.  *See Wolf v. Otter*, No. 1:12-CV-00526-BLW, 2014 WL 2504542, at *5 (D. Idaho June 3, 2014), *aff'd sub nom. Wolf v. Idaho State Bd. of Corr.*, 772 F. App'x 557 (9th Cir. 2019) (finding Plaintiff did not sufficiently exhaust when he failed to submit a grievance in the first place because "the allegation that some grievances filed by other inmates were not answered does not give rise to an inference that Plaintiff [] exhausted all available remedies with respect to his claims in this action").  Accordingly, the Court finds that Plaintiff has not exhausted his administrative remedies as to his recreation yard claims while he was held at George Bailey Detention Facility and recommends that summary judgment be granted in favor of Defendant on this issue.

### ii.    Recreation Yard Claims at San Diego Central Jail

Defendant also moves for summary judgment on whether Plaintiff properly exhausted his administrative remedies as to recreation yard time at San Diego Central Jail.  ECF No. 137-1 at 15.  Defendant does not appear to dispute that a grievance was filed.  *See id.*  However, rather than attach a copy of the grievance, Defendant cites to Plaintiff's allegations in his Third Amended Complaint and his deposition for a description of the grievance.  According to Plaintiff's complaint, he submitted a grievance to M.R. Mesa on March 6, 2017 for denial of out-of-cell exercise.  ECF No. 15 at ¶ 103.  Plaintiff stated the same in his deposition.  ECF No. 137-2 (Goolsby Dep.) at 40:21-43:1.  Plaintiff states that he never received a response to this initial grievance and so he never appealed it any further.  ECF No. 15 at ¶ 103; ECF No. 137-2 (Goolsby Dep.) at 41:2-4.  This version of the facts as Defendant puts forth is not disputed by Plaintiff.

Defendant argues that Plaintiff failed to exhaust his administrative remedies because he failed to take further action after he received no response from the original grievance he filed. For example, Defendant argues that Plaintiff could have alerted a deputy to his outstanding grievance or filed another grievance about the nonresponse. ECF No. 137-1 at 15.

However, many courts within the Ninth Circuit have held that as long as a prisoner waits a reasonable amount of time for a response, the failure of the prison to respond in a timely fashion sufficiently exhausts administrative remedies and deems further relief at the administrative level "unavailable." *See, e.g. Rupe v. Beard*, No. CV-08-2454-EFS PC, 2013 WL 2458398, at *16 (E.D. Cal. June 6, 2013) (noting that a prisoner cannot file suit within "a mere one or two days after an appeal-response deadline has passed" but that "after the inmate has waited a reasonable period of time and has received no response or notice of delay, the failure by prison officials to abide by inmate-grievance regulations must excuse the inmate's failure to exhaust; otherwise, prison officials could indefinitely delay inmates from pursuing legal remedies simply by ignoring all inmate appeals"); *Cotton v. Cate*, No. C 13-3744 WHA (PR), 2015 WL 1246114, at *3 (N.D. Cal. Mar. 17, 2015) (rejecting the argument that a prisoner had to appeal to second and third levels after receiving no response at the first level on summary judgment because the prison "does not cite any authority that a California inmate who has received no response at the first level of review may nevertheless proceed to the second and third levels of review, or any authority that the PLRA requires inmates generally to proceed to higher levels of review when prison officials do not respond at the lower levels"); *Courson v. Cochran*, No. 08-CV-0871 JAH(LSP), 2009 WL 10725678, at *5–6 (S.D. Cal. Feb. 19, 2009), report and recommendation adopted, No. 08CV0871 JAH (LSP), 2009 WL 10725718 (S.D. Cal. June 24, 2009) ("Prison authorities cannot have it both ways - they cannot obstruct an inmate's pursuit of

administrative remedies exhaustion by failing to comply with statutory procedure on the one hand, and then claim that the inmate did not properly exhaust these remedies on the other.") (citation omitted); *Exmundo v. Scribner*, No. 1:06-CV-00205-AWI, 2011 WL 3322608, at *1 (E.D. Cal. Aug. 2, 2011) (noting that "there is authority for the proposition that if a prisoner submitted a timely inmate appeal in compliance with the governing regulations and his appeal received no response, or received a response only after an extraordinary delay, the prisoner has satisfied the exhaustion requirement"); *Jones v. Blanas*, No. CIV S-03-0119DFLDADP, 2005 WL 1868826, at *3 (E.D. Cal. Aug. 3, 2005) (noting that "many Circuit Courts have addressed the effect of prison officials' failure to respond to grievances in a timely manner, and have held that exhaustion occurs when prison officials fail to respond to a grievance within the applicable time limits" and that "if an inmate attempts to exhaust administrative remedies, but that effort is thwarted or ignored, the exhaustion of "available" remedies has been satisfied"). Thus, against this legal background, the Court cannot find that Defendant has met its burden to show the absence of exhaustion if it cannot show that it responded to Plaintiff's grievance in a timely manner.

Defendant also argues that the grievance should have only covered the time period through March 6, 2017 and nothing later—*i.e.* the time period from when Plaintiff entered San Diego Central Jail to the date he filed the grievance. ECF No. 137-1 at 15. Defendant implores the Court to find that Plaintiff did not file a grievance as to other time periods and therefore, failed to exhaust as to those time periods. *Id.* Without submitting as evidence the actual grievance, the Court cannot confirm whether the grievance itself mentions any dates. If not, the only reason a date would be read into the grievance would be because it was filed on March 6, 2017. The only other evidence that is relevant to this issue is Plaintiff's own

deposition testimony, where he states testified that the grievance was focused on specific dates:

> **Q.** And the grievance to M.R. Meza, did it -- was it alleging that you never received any rec yard or was it focused on specifically dates?
> **A.** I believe it was specific dates. I have to double check. I haven't -- I haven't looked at it in a while, but I believe it was since -- I think it's February 7, that's usually the date because once I left 7-E, I didn't -- because that was before I went back. So I believe -- yeah, since 7-E that I haven't received any out-of-cell exercise. I believe I put that on there.
> **Q.** Did you file any subsequent grievances while you were in -- regarding out-of-cell exercise while you were in 6-E or 5-E or George Bailey 5-A?
> **A.** I don't believe so, no.
> **Q.** Why did you decide not to file any subsequent grievances?
> **A.** Because they weren't -- the officers were not following the grievance procedures and responding to my grievances so I felt it was pointless and I had no available -- administrative remedies available.

ECF No. 137-2 (Goolsby Dep.) at 43:19-44:14.

The issue of what time period should be covered by Plaintiff's grievance presents a closer question. On one hand, Defendant does not cite to any authority as to why the grievance must end on the date of its filing if it complains about an ongoing issue. The grievance should be sufficient to place the prison on notice of the problem generally and give officials an opportunity to investigate and remedy the situation, fulfilling the purpose of the exhaustion requirement. Defendants do not provide any argument as to why changing housing modules would have necessarily changed the out of cell exercise regimen that Plaintiff would have faced. On the other hand, Plaintiff's own testimony suggests that he realized he could have filed more grievances but the reason he did not was that he believed they would have gone unanswered. Plaintiff also did testify that the grievance was to "specific dates" but that he needed to check those dates. Later, he says that it was from the

16

time he left 7E—suggesting that maybe the specific date he was referring to might refer to the start date but would not necessarily constrain an end date.

However, on summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party—here, Plaintiff—and the burden of showing lack of exhaustion rests with Defendant. Plaintiff's uncontroverted grievance was sufficient to put the prison on notice of his complaints regarding lack of out of cell exercise and Defendant has not provided any authority for why this grievance must be considered to end on the day it was filed when it complains of an ongoing issue. It is also not in dispute that the grievance was never answered by the prison, and many courts within this circuit have found this sufficient to make further action "unavailable" to the prisoner. *See infra* at 14-15. Accordingly, the Court finds that Defendant has not shown on summary judgment that Plaintiff failed to exhaust his administrative remedies as to his recreation yard claims while he was held at San Diego Central Jail from February 27, 2017 to April 20, 2017 (*see* ECF No. 137-6 (Mendoza Decl.) at 2, ¶ 6) and recommends that summary judgment be denied on this issue.

## C. Denial of Outdoor Exercise

The County also moves for summary judgment on the issue of whether Plaintiff has sufficiently stated a claim under the Eighth Amendment's prohibition against cruel and unusual punishment based on his lack of access to the outdoor recreation yard. ECF No. 137-1 at 15-19.

An Eighth Amendment claim that a prison official has deprived inmates of humane conditions of confinement must meet two requirements, one objective and one subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the objective requirement, the prison official's acts or omissions must deprive an inmate of "the minimal civilized measure of life's necessities.'" *Id.* (*quoting Rhodes v. Chapman*,

452 U.S. 337, 347 (1981)).  The subjective requirement, relating to the defendant's state of mind, requires deliberate indifference.  *Farmer*, 511 U.S. at 834.

Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation."  *Keenan v. Hall*, 83 F.3d 1083, 1089 (1996); *see also Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir. 1979) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates.").

Some cases where a constitutional violation was found involved situations where inmates were in continuous and prolonged segregation where they rarely received outdoor exercise.  *See, e.g.*, *Spain*, 600 F.2d at 199-200 (prisoners were in segregation permanently and for four years); *Toussaint v. Yockey*, 722 F.2d 1490, 1492-93 (9th Cir. 1984) (prisoners were in cells for up to 23.5 hours per day and most were in segregation for over a year); *Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir.2010) (prisoner was denied outdoor exercise for almost 14 months)..  However, cases within this district have found violations based on shorter periods of deprivations as well.  *Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000) (violation found where prisoners were denied all exercise for 6.5 weeks); *Allen v. Sakai*, 48 F.3d 1082, 1088 (9th Cir. 1994) (violation found where prisoners were only provided 45 minutes of exercise a week for 6 weeks); *Norwood v. Woodford*, 583 F. Supp. 2d 1200, 1204 (S.D. Cal. 2008) (violation found on allegations of 39 day deprivation of exercise); *but see Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (emergency lockdown necessitating 28 day exercise deprivation was constitutional).

### i.    Objective Prong

Defendant argues that Plaintiff cannot show that he was deprived of "the minimal civilized measure of life's necessities" because he was provided sufficient

opportunities to have outdoor recreation time. In support, they submit as evidence a declaration for Detentions Deputy Sheriff Mendoza who testifies that he reviewed the records from the Jail Information Management System (JIMS) and deduced that between February 7, 2017 to May 17, 2017, Plaintiff ultimately was offered recreation time for 23 days, for a total of 46.5 hours, which averages 3.875 hours per week.[7] ECF No. 137-6 (Mendoza Decl.).[8]

Specifically, Mendoza testifies that between that time period, Plaintiff had 32 days of scheduled exercise time. *Id.* at ¶ 7. On 20 of these days, there was a record in the system regarding exercise time. *Id.* at ¶ 8. Plaintiff was shown to have refused recreation yard time 7 times, and started it 5 times—for a total of 12 times. *Id.* at ¶ 10. No exercise time occurred on the remaining 8 days because of a reason such as short staffing, critical incidents, inclement weather, or needing to use the space as a holding cell. *Id.* at ¶¶ 8, 10. For the remaining 12 days, though Plaintiff was scheduled to have exercise time, there was no entry in the system. *Id.* at ¶ 9. Mendoza explains that this does not mean he did not have exercise time and it may just not have been recorded in the system. *Id.* In addition to the scheduled days, Mendoza testifies that Plaintiff received 11 additional unscheduled days as make up for when the recreation yard was unavailable—out of these, Plaintiff started yard time 7 times and refused 4 times. *Id.* at ¶ 11. Thus, Mendoza concludes that Plaintiff was offered recreation time 23 days during the time period for a total of

---

[7] The Court will accept this 3.875 hours number but notes that Defendant does not explain how it is calculated. Between February 7, 2017 to May 17, 2017, there are 99 days, which translates to 14 weeks and 1 day. 46.5 hours divided by 14 weeks is 3.32 hours per week.

[8] The Court notes that part of this time period includes times for which Plaintiff was at George Bailey Detention Facility which the Court recommends be found not exhausted above. However, since no actual records were included by Defendant and Mendoza only testifies as to this time period, the Court cannot independently calculate exercise time for the remaining time period at San Diego Central Jail. The Court will thus rely on this time period for this discussion.

46.5 hours.[9]  Over 23 days, that averages to 3.875 hours per week where exercise time was offered.  *Id.*  Defendant argues that this record shows that Plaintiff was offered a constitutionally appropriate amount of exercise time and that it also comports with Title 15 regulations which require that county jails provide inmates with a minimum of 3 hours of recreation time every seven days.  *See Minimum Standards for Local Detention Facilities*, *Exercise and Recreation*, Cal. Code Regs. tit. 15, § 1065.

Plaintiff refutes this evidence.[10]  He argues that Defendant did not submit any actual records from JIMS substantiating Mendoza's declaration and instead, states in his declaration that he never received any exercise time between February 7 to May 15, 2017.  ECF No. 147 at 30; *id.* at 51-52 (Goolsby Decl.) at ¶ 16.  As evidence, he submits some printouts from the San Diego Sheriffs Department's Inmate History Summary Report.  One report, with a begin date of December 12, 2016 to May 17, 2017, shows that Plaintiff's inmate status went to "RECS" only 4 times—on December 15 and 16 and January 12 and 27—none of which fall in the

---

[9] Defendant does not provide an exact explanation at how Mendoza arrives that this number, but explains that San Diego Central Jail had 1.5 hour exercise increments and George Bailey Detention Facility had 3 hour exercise increments. ECF No. 137-6 at ¶ 13.

[10] In Defendant's Objection to Information in Plaintiff's Opposition, Defendant requests that the Court disregard the arguments and evidence Plaintiff submits on being offered recreation time at night and having to choose between sleep and exercise. ECF No. 150-2 at 2. Defendant argues that Plaintiff's complaint did not include allegations between having to choose between sleep and exercise and that his sleep deprivation claims have been dismissed. ECF No. 150-2 at 3-5. The Court overrules these objections. It is true that Plaintiff's sleep deprivation claims were dismissed but those claims related to the lighting schedule at the jail, noise caused by mentally ill patients, volume of the television, and late night razor drop-offs and cell counts. ECF No. 97 at 4-5. This claim is distinct from the lack of sufficient exercise claim at issue here. The Court finds that the evidence objected to here is encompassed and relevant to what Plaintiff raised in his Third Amended Complaint.

time period at issue here. ECF No. 147 (Ex. Z) at 239. Another report covering the same time period showed two dates for "RECU" events ("Rec yard unavailable") on the dates of December 31 and March 2. *Id.* (Ex. AA) at 241. A third report from the same time period shows "RECR" events ("Rec yard refused") 11 times during the relevant time period, with timestamps varying from 8:05 p.m. to 2:45 a.m.[11] *Id.* (Ex. AB) at 243. In his declaration, Plaintiff claims that he never refused recreation yard time and even though he saw these records, he maintains that he was never asked whether he wanted to go so deputies may have recorded these entries without asking him because he was sleeping at that time. ECF No. 147 (Goolsby Decl.) at 52, ¶ 16.

As to the issue of how many hours Plaintiff actually received, based on this record, the Court finds that there is a genuine dispute of material fact as to whether Plaintiff received a constitutionally acceptable amount. Under Plaintiff's version of events, which the Court must consider viewing the evidence in the light most favorable to him as the nonmoving party, Plaintiff never received any actual yard time between February 7 and May 15—a period of 97 days. Not receiving any outdoor exercise for such a duration could constitute a constitutional violation. *See, e.g.*, *Lopez*, 203 F.3d at 1133; *Allen*, 48 F.3d at 1088; *Norwood*, 583 F. Supp. 2d at 1204.

The records submitted by Plaintiff do show that he "refused" yard time 11 times during the relevant time period. All of the dates with a "refused" entry fall within the time Plaintiff was at San Diego Central Jail and accepting that exercise time at San Diego Central Jail is 1.5 hours, this would be 16.5 hours during the 99

---

[11] The exact times show Plaintiff refusing recreation yard time on March 5 at 8:56 p.m., March 15 at 11:59 p.m., March 17 at 12:53 a.m., March 19 at 2:48 a.m., March 23 at 12:24 a.m., April 4 at 2:30 a.m., April 6 at 2:50 a.m., April 11 at 2:05 a.m., April 13 at 3:45 a.m., April 14 at 10:09 p.m., and April 15 at 8:05 p.m. ECF No. 147 at 243.

days, 14 week period—effectively equating to 1.18 hours per week. This would cut close to the 45 minutes for 6 weeks that the Ninth Circuit to meet the objective element of deprivation of a basic human need in *Allen v. Sakai*. 48 F.3d at 1088. Even more problematic here is that Plaintiff did not actually receive this exercise time—the records show that he refused it and by his own testimony, he states that he was never asked because he may have been sleeping during those times. ECF. No. 147 (Goolsby Decl.) at 52, ¶ 17. Out of the 11 times, 8 occurred at around midnight or later. *See* ECF No. 147 (Ex. AB) at 243. The Ninth Circuit has previously held that "an inmate cannot be forced to sacrifice one constitutionally protected right solely because another is respected." *See Allen v. City and County of Honolulu*, 39 F.3d 936, 940 (9th Cir. 1994) (finding it impermissible for prisoners to choose between using the prison law library and exercising outdoors); *see also Hebbe v. Pliler*, 627 F.3d 338, 343-44 (9th Cir. 2010) (finding same). Similarly here, "[i]nmates are also entitled to confinement conditions which do not result in chronic sleep deprivation." *Grizzle v. County of San Diego*, 2018 WL 1603212, at *6 (S.D. Cal. April 3, 2018) (citing *Keenan*, 83 F.3d at 1090). Given the records showing when Plaintiff supposedly refused exercise yard time and his testimony that he was not actually asked whether he wanted to exercise during those early hours of the morning, a genuine dispute of material fact here precludes summary judgment as to the objective inquiry under the Eighth Amendment.

Defendant also argues that even if Plaintiff could show he was not provided with constitutionally permissible outdoor exercise time, he still cannot show that he suffered any medical effects. ECF No. 137-1 at 18-19. In his complaint, Plaintiff alleged that he suffered from headaches, breathing difficulties, muscle and ligament tightening, cardiovascular regression, weight gain, and depression as a result of the denial of exercise. ECF No. 15 at ¶ 102. Defendant submits an expert report from emergency medicine physician, Richard Stennes, M.D., who states that, based on

his review of Plaintiff's records, Plaintiff failed to complain of any of his alleged symptoms to any medical personnel. ECF No. 137-2 (Ex. N) at 108. He further opined that a five month deprivation of sunlight exposure would not be long enough to cause or exacerbate any of the issues Plaintiff alleged in his complaint. *Id.*

Plaintiff objects to this evidence, noting that Dr. Stennes never examined him and only reviewed his records. ECF No. 147 at 31; *id.* (Goolsby Decl.) at 52-53, ¶ 21. Plaintiff further states in his declaration that he suffered from the same physical ailments he alleged in his complaint and the reason he never sought medical attention was because he knew that that medical could not give him more exercise time. *Id.* at 52-53, ¶¶ 20, 22. Generally, while a party's declaration may be self-serving, courts may only reject such evidence if it "states conclusions and not facts that would be admissible into evidence." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497-98 (9th Cir. 2015); *see also S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir.2007); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Plaintiff's declaration, standing alone, is conclusory as to the ailments he alleges he suffered, essentially mirroring his allegations in his complaint. However, Plaintiff does submit other declarations from other prisoners who provide some additional corroborating evidence on this point. For example, Elliot Grizzle states that he would sometimes talk to Plaintiff in the dayroom and that he "complained of severe headaches, fatigue, depression, inability to concentrate and/or think clearly, as well as high levels of stress as well as other physical and psychological issues." ECF No. 147 (Grizzle Decl.) at 58, ¶ 9. Another inmate, Samuel Hardcastle, stated that "I seen [Plaintiff] physical and well being deteriorated rapidly. He complained of headaches and abdominal pain. Looked extremely tired all the time and listless.

[Plaintiff] became sick as well. He looked very stressed and depressed." ECF No. 147 (Hardcastle Decl.) at 61, ¶ 4. In addition, Plaintiff testified in his deposition that he started having headaches in February 2017 and that he would have them approximately 3 to 5 times a week. ECF No. 147 at 71:4-25. Plaintiff also testified that he was suffering from asthma attacks 2 to 3 times a week, experiencing pain and problems with joint movement in his elbows and wrists, cramping in his muscles, particularly in the limbs, and suffering from tight hamstrings. *Id.* at 72:2-9.

Again, with this record in mind, the Court finds that there is a dispute of material fact as to whether Plaintiff suffered the harm he alleged. Thus, the Court finds that, based on the conflicting evidence that has been presented by the parties, a rational fact finding might find that Defendant has not provided Plaintiff with his constitutionally permitted outdoor exercise time during the relevant time period, meeting the objective prong of the Eighth Amendment violation requirements.[12]

### ii.    Subjective Prong

In its reply brief, Defendant focuses on the issue of whether there is a triable issue of fact as to whether the prison acted with deliberate indifference, as required under the Eighth Amendment. ECF No. 150 at 9-10. This inquiry is a two-part

---

[12] Defendant also raises one additional issue in its brief—regarding whether the yard space provided for prisoners during yard time is sufficiently "outdoor." ECF No. 137-1 at 22-23. Specifically, Defendant argues that because San Diego Central Jail is in an urban setting, the recreation area provides for fresh air and sunlight to come in, but is not the open roof space that a prison in a rural area might provide. *Id.* Defendant additionally argues that the facilities met the requirements under Title 24 standards. *Id.* at 9; *see also* ECF No. 137-2 at 157. Plaintiff refutes this argument, pointing to *Spain*'s language that "[t]he cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel punishment." 600 F.2d at 200. Because the Court concludes that Plaintiff did not receive the required amount of exercise time, regardless of the sufficiency of the yard space itself, it will not reach this issue at the summary judgment stage.

inquiry, where the prisoner must first show that prison officials were aware of a "substantial risk of serious harm" to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). This could be met if it is shown that the risk posed by the deprivation was obvious. *Id.* at 842. The second part of this inquiry is to show that prison officials has no "reasonable" justification for that deprivation, in spite of the risk. *Id.* at 844.

This question presents a close call. There is some evidence that Plaintiff attempted to make prison officials aware of his denial of outdoor exercise. Plaintiff testified, and Defendant does not appear to dispute, that he filed a grievance on March 6, 2017 regarding this issue, which he submitted to M.R. Meza. ECF No. 137-2 (Goolsby Dep.) at 39-12-41:1; *see also* ECF No. 147 (Goolsby Decl.) at 52, ¶ 19. When he did not receive a response, Plaintiff testified that he wrote and sent a letter to Sherriff William Gore in late March or early April complaining about the denial of out of cell exercise. ECF No. 137-2 (Goolsby Dep.) at 42:7-25, 43:10-18; ECF No. 147 (Goolsby Decl.) at 53, ¶ 24. A copy of the letter was not submitted to the Court and Plaintiff testifies that he tried to get a copy of the letter but he was not allowed while in county jail. ECF No. 137-2 (Goolsby Dep.) at 42:12-19. Plaintiff also testified that he "continually asked several officers for out-of-cell exercise and th[at] I've been denied all outside and out-of-cell exercise." *Id.* at 42:25-43:2. Based on this evidence, there is triable issue as to whether prison officials were sufficiently aware of Plaintiff's complaints regarding outdoor exercise.

Defendant's argument in the reply brief seems to center more on the issue of whether prison officials would have been aware of a "substantial risk or harm" to Plaintiff's health. Specifically, Defendant argues that Plaintiff himself admits in his declaration and deposition that he never complained to any jail staff about the health issues he alleges he suffered. ECF No. 150 at 14; *see also* ECF No. 147 (Goolsby Decl.) at 53, ¶ 22; ECF No. 137-2 (Goolsby Dep.) at 45:12-23.

Defendant also argues that that these alleged health injuries would not have been patently obvious if he never reported them.  ECF No. 150 at 10.  However, the inquiry here does not focus on whether a prison official would have "specific knowledge that harsh treatment of a particular inmate, in particular circumstances, would have a certain outcome."  *Thomas*, 611 F.3d at 1151.  "Rather, we measure what is 'obvious' in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved."  *Id.*  In *Thomas*, the court noted the importance of exercise as a "basic human need" and specifically pointed out that California regulations require three hours of exercise a week.  *Id.*; *see also Allen*, 48 F.3d at 1088 (noting that defendants "had a goal of providing five hours exercise per week and that, despite their awareness of this goal, they knowingly failed to provide" the sufficient hours); *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010) ("If the prison allots a standard number of hours per week for exercise, the prison officials are aware that denial of this exercise for a substantial period creates an excessive risk to a prisoner's health.").  Thus, even without evidence of actual knowledge regarding Plaintiff's alleged health injuries, a jury could conclude that the length of duration of the deprivation coupled with the prison's own policies show sufficient knowledge of the risk to health.

The second part of this subjective inquiry is whether the prison officials may have a "reasonable" justification for the deprivation.  Defendant does not advance any argument in its briefing as to whether there is a reasonable ground for any alleged deprivation of Plaintiff's right to outdoor exercise.  However, in an exhibit submitted by Plaintiff, Administrative Sergeant at the San Diego Central Jail responded to another prisoner's similar complaint about having to choose between yard time and sleep and stated, "due to everyday jail procedures and population

needs this is the time that is available for administrative segregation inmates to use the recreation yard." ECF No. 147 at 184-85.

Courts in the Ninth Circuit have found such nonspecific arguments insufficient at the summary judgment stage. For example, the Court in *Allen* rejected defendant's similar argument, pointing to logistical problems, and found that such vague explanation was not sufficient at the summary judgment stage to justify the deprivation. 48 F.3d at 1088 ("A rational fact-finder after hearing the evidence might determine that the defendants acted with at least deliberate indifference to [Plaintiff']s basic human needs . . . by placing inconsequential logistical concerns that might be no more than matters of convenience above [his] need for exercise."); *see also Grizzle*, 2018 WL 1603212, at *6 (finding constitutional violation possible where defendant did not provide a valid reason for scheduling recreation time during the same time period where lights are dimmed to permit sleeping).

Thus, the Court finds that a rational fact finder could find, based on the evidentiary record before it, that Defendant had sufficient knowledge of the deprivation and its health effects without a valid reason. The Court recommends that summary judgment be denied on this issue.

### D.    Municipal Liability

Finally, the County moves for summary judgment on the issue of whether it can be held liable for either the administrative segregation placement claim or recreation yard claim under municipal liability.[13] ECF No. 137-1 at 19-25.

A municipality may be liable under § 1983 for deprivations of constitutional rights resulting from their formal policies or customs or as the result of a pervasive

---

[13] Previously, on ruling on Defendants' motion to dismiss, the Court dismissed all the individual defendants and allowed the administrative segregation placement claim and recreation claim to proceed against the County. *See* ECF No. 97 at 10.

practice.  *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *City of Canton, Ohio v. Harris,* 489 U.S. 378, 387 (1989).  A municipality cannot be held liable under § 1983 "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell,* 436 U.S. at 691 (emphasis original); *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior.").  Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("[I]t is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible").  Plaintiff must establish that "the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [they] suffered." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) (citing *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007)).

A "policy" is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008); *Long*, 442 F.3d at 1185.

> There are three ways to show a policy or custom of a municipality: (1) by showing 'a longstanding practice or custom which constitutes the standard operating procedure of the local government entity'; (2) 'by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision'; or (3) 'by showing that an official

28

with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.'"

*Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008) (quoting *Ulrich v. Cty. & Cnty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)). A policy "need only cause [the] constitutional violation; it need not be unconstitutional per se." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994) (citations omitted); *see also Koistra v. Cnty. of San Diego*, 310 F. Supp. 3d 1066, 1085 (S.D. Cal. 2018).

As a preliminary matter, Defendant correctly states that municipal liability can only be found if there is constitutional violation in the first place. *See, e.g.*, *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("While liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights."). This threshold is met here on summary judgment because, for the reasons stated above, the Court finds that there are disputes of material fact that preclude granting summary judgment in favor of Defendant on both the administrative segregation placement due process claim and the Eighth Amendment outdoor exercise claim.

Defendant advances similar arguments as to why there cannot be municipal liability against it for either of Plaintiff's claims: 1) the individual deputies (*i.e.*, Leon in the case of administrative segregation placement and various individual deputies in charge of administering the exercise program) involved were not policymakers, 2) no individual with policy making violated or ratified a subordinate's unconstitutional decision, including Sheriff Gore, who cannot be said to have "ratified" decisions based solely on Plaintiff's letters to him, and 3) the county's written policies with regards to exercise or placement cannot be said to be unconstitutional because they comply with state guidelines and inspections, and to

the extent Plaintiff suffered an unconstitutional deprivation, he had not put forth evidence to show that it was widespread .  ECF No. 137-1 at 22-25.

The Court agrees with Defendant on the first issue—Plaintiff has not put forth any evidence or argument that any of the individual deputies had any policy making authority or that they were delegated that authority by a policy maker.  The Court also agrees on the second issue.  Plaintiff's evidence of his testimony stating that he sent Sheriff Gore letters complaining about his placement and lack of outdoor exercise is not sufficient to establish that Sherriff Gore ratified either decision.[14]  "A policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification.  Instead, a plaintiff must prove that the policymaker approved of the subordinate's act." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).  Here, a letter mailed to Sheriff Gore, at best, could potentially show that he received it and read it—but Plaintiff does not have any further evidence of any further action.

Plaintiff's main arguments as to why the county may be held accountable are based on policy arguments, so the Court will address this for each claim in turn.

### i. Exercise Claim

Plaintiff's main argument as to why municipal liability should be found is that Defendant has a policy of only allowing inmates in administrative segregation to exercise during the middle of the night.  ECF No. 147 at 37; *see also* ECF No. 147 (Ex. Y) at 236-37 ("Exercise Programs and Yard Schedule" stating that inmates would have exercise between 1900 hours (7:00 p.m.) to 0500 hours (5:00 a.m.)).

---

[14] Plaintiff argues in his opposition that Sheriff Gore also ratified the decision by signing off on San Diego County Sheriff's Department's Jail Population Management Unit Training Manual.  ECF No. 147 at 39.  This argument, however, is more apropos to the policy issue versus the individual action of any individual subordinate.

Plaintiff argues that this policy is the reason he was shown to have "refused" yard time when he actually was likely asleep and was not asked. *Id.* at 38.

Defendant objects to Plaintiff's inclusion of the policy as to exercise times, arguing that it should not be considered because his complaint does not include any allegations about being forced to exercise at night. ECF No. 150 at 17; ECF No. 150-2. However, as the Court discussed above, *see infra* at 20 n.10, this is sufficiently encompassed in his claim of not having any outdoor exercise time during the relevant time period. Defendant argues that its own policies dictate that inmates like Plaintiff should get at least 3 hours of outdoor exercise per week, which is sufficient to pass constitutional muster. However, a rational fact finder could find that the policy of offering exercise time during the late evening and early morning hours could have the practical effect of resulting in a lot of "REC YARD REFUSED" times, as it did for Plaintiff, undermining Defendant's policy of providing 3 hours a week of outdoor exercise. The Court is, of course, not making any ruling as to the actual constitutionality of this policy at this stage but on summary judgment, cannot find that, as a matter of law, a jury could not find municipal liability if it were to find a constitutional violation in the first place. This does not end the inquiry on summary judgment however—the Court must also consider whether the policy caused the injury as the moving force behind the violation. *Monell*, 436 U.S. at 694. This requires a "direct causal link" between the policy and injury. *See Koistra v. Cty. of San Diego*, 310 F. Supp. 3d 1066, 1086 (S.D. Cal. 2018). Here, the records submitted by Plaintiff during the relevant time period show only that he was offered and refused exercise time during the hours as encompassed in the exercise time policy, whereas Defendant states that Plaintiff was offered more than the required outdoor exercise time but without specific details on summary judgment as to what times of the day that time occurred. Based on this record, a rational fact-finder could find that the timing of the exercise

offered caused the deprivation that Plaintiff alleges. Accordingly, the Court recommends that Defendant's request for summary judgment on municipal liability as to the outdoor exercise claim be denied.

### ii. Administrative Segregation Placement Claim

Plaintiff's argument in his opposition regarding this claim appears to be partly that some of Defendant's policies were not adhered to (for example, the written policy calls for a written notice J-72 form to be given to segregated inmates, but Plaintiff claims he never received one), but also partly that the policy itself, as written, does not require some of the constitutionally required elements, such as a "hearing," opportunity to be actually heard, or a reason for the placement. ECF No. 147 at 37-38.

As stated above, the Court found that there is a material dispute as to exactly what factually happened that resulted in Plaintiff's initial placement in administrative segregation. Defendant does state though, through its declarant Sergeant Froistad, that based on his review of the records, Plaintiff's classification into administrative segregation "complied with policies and procedures." ECF No. 137-4 (Froistad Decl.) at ¶ 32. In its reply in response to Plaintiff's factual description of events as he believed they occurred, Defendant characterizes the differences as disputes on "minutiae" of the process, but does not change its position as to policy compliance and states that Plaintiff's version of events would not have complied with its policy. In addition, there is a direct causal link because it is the exact placement policy and procedures that Plaintiff objects to. Accordingly, the Court recommends that Defendant's request for summary judgment on municipal liability as to the administrative segregation due process claim also be denied.

//

//

**V.    Conclusion**

For the foregoing reasons, the Court, **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED IN PART AND DENIED IN PART** as follows:

(1)    Summary Judgment on Plaintiff's Due Process Claim related to his placement in administrative segregation be DENIED;

(2)    Summary Judgment on whether Plaintiff exhausted his outdoor exercise claim while at George Bailey Detention Facility be GRANTED;

(3)    Summary Judgment on whether Plaintiff exhausted his outdoor exercise claim while at San Diego Central Jail be DENIED;

(4)    Summary Judgment on Plaintiff's Eighth Amendment Claim related to denial of outdoor exercise be DENIED; and

(5)    Summary Judgment on municipal liability be DENIED.

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **March 3, 2020**, any party to this action may file written objections and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections must be filed and served on all parties no later than **March 10, 2020**.

//
//
//
//
//

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS ORDERED.**

Dated: February 18, 2020

Hon. Nita L. Stormes
United States Magistrate Judge